[No. B175413. Second Dist., Div. Two. June 2, 2005.]

JOSE LUIS JIMENEZ, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## Counsel

Emenike Law Firm, Chukwudum N. Emenike and George E. Omoko for Plaintiff and Appellant.

Fuentes & McNally, Raymond J. Fuentes and John M. Bowers for Defendants and Respondents.

## Opinion

**BOREN, P. J.**—This is an appeal from a judgment in a case alleging a civil rights violation (42 U.S.C. § 1983 (section 1983)), premised on the theory of an unreasonably extended detention until appellant was cleared by DNA testing of the rape and related charges against him. The trial court granted summary judgment against plaintiff Jose Luis Jimenez and in favor of defendants County of Los Angeles, Detective Ruthie Sauls and Detective Steve Blagg. We affirm, as after the officers acted with abundant probable cause for arrest, there was no undue delay regarding plaintiff's ultimate vindication and release, no substantive due process violation, and no loss of qualified immunity by the officers.

### FACTUAL AND PROCEDURAL SUMMARY

In July of 2001, a 14-year-old mentally challenged girl was raped in the back of a van at Lynwood Park in Los Angeles. She gave to Detective Sauls a physical description of the assailant and a description of the van. The victim also worked with a sketch artist, who then prepared a composite drawing of the suspect. Two days later, Detective Sauls interviewed several witnesses at Lynwood Park who recalled seeing a van matching the description of the suspect's van and one witness who identified the composite drawing as the driver of the van.

Later that day, Detective Blagg and other officers set up surveillance at the park. They observed a vehicle and a driver matching the descriptions given by the victim and witnesses. The suspect was plaintiff Jose Jimenez. Detective Blagg detained plaintiff and later arrested him for several outstanding traffic warrants and driving with a suspended license.

The victim then viewed a "six-pack" photo lineup and identified plaintiff as one of three possible suspects. The victim also stated that she was "almost sure" plaintiff's van was the one in which in which she had been raped.

Moreover, a volunteer bloodhound handler, Ted Hamm, and his scent dog connected the victim to the plaintiff. The handler provided his bloodhound with scent pads previously made from the victim's clothing and the victim. The bloodhound then found plaintiff in an interview room at the police station. A volunteer K-9 scent handler, Joe D'Allura, and his scent dog also connected the victim to plaintiff's van. The dog smelled the scent pad from the van and then "alerted" on the victim's scent pad, connecting the victim to plaintiff's van.

Based on the foregoing information, on July 11, 2001, Detective Sauls recommended to the district attorney that plaintiff be charged with child sexual abuse, kidnapping and rape. Plaintiff was arraigned on July 15. Approximately a month after filing the case, the prosecutor became aware that an INS (Immigration and Naturalization Service) hold had been placed on plaintiff.

Meanwhile, on July 6, Detective Sauls had obtained a saliva sample from plaintiff for DNA analysis. The sample was kept in storage and not immediately sent out for analysis. Due to the volume of DNA analysis requests, it was the policy of the sheriff's department to prioritize such requests. Generally, it did not process DNA requests until after a trial date has been set. On September 21, 2001, Detective Sauls requested that DNA analysis be performed for plaintiff's case, as a court date was set for November 16.

On October 22, 2001, the Serological Research Institute (SRI), an independent outside agency, issued a DNA analysis report, which excluded plaintiff as the rapist. On October 31, the crime lab received the report and on that day forwarded it to Detective Sauls. Also on October 31, Detective Sauls advised the prosecutor about the DNA results. On November 1, the prosecutor wrote a memo explaining the situation to the head deputy district attorney. He also that day informed plaintiff's defense counsel of the DNA results, and they "agreed to have [plaintiff] ordered out for hearing" on the next day, November 2.

At the hearing on Friday, November 2, 2001, the criminal case against plaintiff was dismissed.

Although the rape and related charges were dismissed, plaintiff was not released from custody because of a pending hearing in another case involving the charge of driving with a suspended license. Plaintiff had been remanded to

custody on October 29, 2001, for a hearing on that charge on November 7, 2001. At that November 7 hearing, the charge of driving with a suspended license was dismissed. But the INS detainer hold remained, and the INS took custody of plaintiff from the sheriff's department on November 13.

Meanwhile, plaintiff's defense counsel sought an order finding plaintiff factually innocent of the charges. The prosecutor opposed the motion, as he believed plaintiff was involved in the crime as an aider and abettor either before or after the crime, based on the victim's identification during the preliminary hearing, the alerts of the two scent dogs, the matching vehicle description, the matching suspect description, and the composite sketch. Nonetheless, on December 12, 2001, based on DNA evidence, the court granted plaintiff's motion for a finding of factual innocence. On that day, plaintiff was released from custody.

In September of 2002, plaintiff filed the present civil action, alleging claims under section 1983 and state tort law. Specifically, plaintiff alleged causes of action for false arrest, malicious prosecution, slander, negligent hiring and retention of unfit employees, negligent supervision, conspiracy to violate civil rights with damages from false imprisonment and malicious prosecution, and section 1983 claims against both Officers Sauls and Blagg and the County of Los Angeles for violation of the Fourth and Fourteenth Amendments' right to be free from unreasonable search and seizure of the person. The trial court granted defendants' demurrer without leave to amend as to all of plaintiff's state law claims.

Thereafter, defendants' motion for summary judgment urged that plaintiff could not establish a constitutional violation upon which to base the remaining section 1983 claim or, alternatively, that defendants Sauls and Blagg were entitled to qualified immunity. Plaintiff's opposition conceded that defendants had probable cause to arrest and detain him, and thus plaintiff indicated he would dismiss the cause of action for unreasonable search and seizure based on the Fourth Amendment—but not the Fourteenth Amendment's right to due process. Plaintiff then for the first time specifically alleged as a legal issue the purported delay in analyzing reference samples of DNA until a trial date was set, and a delay of approximately six weeks after the existence of the exculpatory DNA report was known by defendants (Oct. 31, 2001) until the time he was found factually innocent (Dec. 12, 2001).

In response to this new issue, defendants submitted in their reply papers in support of their motion for summary judgment several items of new evidence. In apparent rebuttal to plaintiff's newly raised issue, defendants' reply papers included: (1) the declaration of the deputy district attorney who prosecuted the underlying criminal matter; (2) the declaration of a supervisor of records

in the sheriff's department indicating the existence of an INS hold or detainer in plaintiff's underlying criminal case; and (3) a request for judicial notice of the case files in plaintiff's underlying criminal matter.

Plaintiff did not object to such evidence contained in defendants' reply papers. Indeed, at the hearing on the summary judgment motion, regarding the period of incarceration after receipt of the DNA results, counsel for plaintiff stated: "[T]he other period of incarceration was the period coinciding with the release of the D.N.A. testing result which I'm not going to be pursuing in light of the reply, and that information was passed on to the D.A. and there were holds on the case."

The court granted summary judgment in favor of defendants, based on the following: the existence of probable cause to arrest plaintiff; the absence of any constitutional right to a DNA test; the declaration of the deputy district attorney indicating the absence of any delay in turning over the DNA test to the prosecutor and the prompt dismissal of the criminal case against plaintiff two days later; and plaintiff's continued incarceration as attributable to a hold from an INS detainer and a hold from an unrelated criminal matter.

## DISCUSSION

I. *The plaintiff's complaints about the trial court's constitutional analysis and alleged procedural flaws are unavailing.*

█ Plaintiff contends that the trial court erred in failing to appreciate the difference between two types of false imprisonment cognizable under section 1983—the Fourth Amendment's right to be free of arrest without probable cause, and the Fourteenth Amendment's substantive due process right to be free of unlawful confinement. Indeed, as observed in Lee v. City of Los Angeles (9th Cir. 2001) 250 F.3d 668, 683 (*Lee*), "a detainee has 'a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'" Constitutional attacks on the "procedures pertaining to the lab test results and to the release of detainees are properly categorized as substantive due process claims." (*Pennington v. Hobson* (S.D.Ind. 1989) 719 F.Supp. 760, 776 (*Pennington*).) "[T]here is a substantive due process right to release within a reasonable amount of time after law enforcement officials learn that a detainee is innocent of the charges on which he was detained." (*Id.* at p. 779.)

Plaintiff complains specifically that the "trial court did not pay any heed to the fact that [plaintiff] argued that the basis of his action was what the [defendants] did after they collected his DNA sample which they stored in their freezer due to a backlogged testing program and waited until [defendant]

Sauls informed the Forensic Biology Section that a trial date had been set in the criminal case." However, as indicated by the trial court's order granting summary judgment, it focused in part on the alleged "delay in providing DNA tests results" to the prosecutor and noted that there was no constitutional right to a DNA test.

■ In any event, it is well settled that on appeal following summary judgment the trial court's reasoning is irrelevant, and the matter is reviewed on appeal de novo. (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457 [81 Cal.Rptr.2d 165]; *Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925 [68 Cal.Rptr.2d 571].) We exercise our independent judgment as to the legal effect of the undisputed facts (*Spitler v. Children's Institute International* (1992) 11 Cal.App.4th 432, 439 [14 Cal.Rptr.2d 197]) and must affirm on any ground supported by the record. (*Becerra, supra,* 68 Cal.App.4th at p. 1457.)

Moreover, plaintiff's complaint that defendants did not move for summary judgment based on the absence of triable issues of fact relating to the Fourteenth Amendment false imprisonment issue is unavailing. The record reveals that plaintiff did not raise his Fourteenth Amendment substantive due process claim *premised on DNA testing policies* until after defendants had filed their motion for summary judgment. Indeed, plaintiff deposed a sheriff's department criminalist regarding crime lab DNA polices over a month after the motion for summary judgment, and never petitioned the trial court for leave to amend the complaint to assert claims specifically relating to DNA testing. Thus, defendants' first opportunity to respond to this new issue (with declarations and a request for judicial notice) came in defendants' reply papers in support of their motion.

■ Plaintiff's failure to object at the trial court level to defendants' evidence at that stage waived the issue for appellate review. We acknowledge that consideration of late-filed evidence over objection may violate the opposing party's due process right to be fully informed of the issues it must meet to defeat the summary judgment motion. (Compare *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499] with *Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466, 1480 [1 Cal.Rptr.3d 185], noting broad discretion to consider such belated evidence.) Nonetheless, the opposing party must object to the evidence or waive any complaint about the trial court's consideration of the evidence. (See *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1426 [120 Cal.Rptr.2d 392].) Here, plaintiff did not object and thus waived the issue on appeal.

II. *As the plaintiff did not suffer an unconstitutional deprivation of liberty, such as to support a section 1983 claim, the trial court properly granted summary judgment.*[1]

 At the outset, we note that " '[s]ubstantive due process' analysis must begin with a careful description of the asserted right." (*Reno v. Flores* (1993) 507 U.S. 292, 302 [123 L.Ed.2d 1, 113 S.Ct. 1439].) For example, in *Washington v. Glucksberg* (1997) 521 U.S. 702 [138 L.Ed.2d 772, 117 S.Ct. 2258, 117 S.Ct. 2302] (*Washington*), the Court distinguished properly and narrowly defined rights such as the rights "to hasten impending death by consuming lethal medication" or "to refuse unwanted medical treatment" from broadly stated rights, such as "self-sovereignty" or "personal autonomy," and adopted the narrower definitions of the asserted rights. (*Id.* at pp. 722–725; see also *Reno v. Flores, supra,* at p. 302.) Because of inherently subjective factors in defining substantive due process rights and a lack of precise " 'guideposts for responsible decisionmaking in this unchartered area,' " courts are reluctant to expand the concept of substantive due process and "therefore 'exercise the utmost care whenever we are asked to break new ground in this field.' " (*Washington, supra,* 521 U.S. at p. 720.)

 In the present case, plaintiff has described his so-called unconstitutional deprivation of liberty as "incarceration absent a criminal conviction." But this asserted liberty interest is an issue-begging generalization that is far too broadly stated. For example, incarceration of an innocent person pursuant to a valid warrant based on probable cause is certainly an "incarceration absent a criminal conviction," but it is not necessarily unconstitutional. (See *Baker v. McCollan* (1979) 443 U.S. 137, 144–145 [61 L.Ed.2d 433, 99 S.Ct. 2689].)

A more narrow and proper characterization of plaintiff's claim would be, for example, whether one who has been detained with probable cause for a crime has a substantive due process right to an expedited confirmation of probable cause by compelling the prosecution to obtain prompt laboratory analysis of relevant evidence. Significantly, the issue as properly framed is substantially similar to the approach taken by the trial court, which found that plaintiff "did not have a constitutional right to a DNA test."

---

[1] Defendants argue estoppel or waiver of all plaintiff's due process claims, since plaintiff's counsel advised the trial court and opposing counsel that plaintiff would not pursue claims relating to the time period after the deputy district attorney's receipt of DNA results. However, since we elect to address plaintiff's contention on its merits, it is unnecessary to address defendants' assertion that plaintiff is either estopped from asserting or has waived his right to assert all substantive due process claims relating to alleged over-detention for the period after receipt of the DNA test results.

■ The second step in a substantive due process analysis requires the court to determine whether the right or liberty interest sought to be protected is a "fundamental" one. (*Washington, supra,* 521 U.S. at p. 720.) In other words, we must determine whether the right is " 'deeply rooted in this Nation's history and tradition,' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [it was] sacrificed.' " (*Id.* at pp. 720–721.) If the asserted right is not such a fundamental interest, it is not entitled to protection under the Due Process Clause of the Fourteenth Amendment.

To determine if the asserted right is "deeply rooted," courts look to how "[o]ur Nation's history, legal traditions, and practices" have treated the issue. (*Washington, supra,* 521 U.S. at p. 721.) The issue here, confirmation of probable cause by laboratory testing to avoid the possibility of an unnecessary over-detention, has been addressed in several cases, principally *Jimenez v. New Jersey* (D.N.J. 2003) 245 F.Supp.2d 584 (*Jimenez*) and *Pennington, supra,* 719 F.Supp. 760.

In *Jimenez,* an arrestee brought a state court action alleging violation of constitutional rights and various state tort claims after the criminal charges against him were dropped. He had remained in jail after arrest for approximately 22 months, at which point all charges were dismissed. The only alleged constitutional violation raised by the plaintiff there was that, while incarcerated, he had requested a DNA test and one was not administered as expeditiously as he expected, thereby leading to his 22-month incarceration. (*Jimenez, supra,* 245 F.Supp.2d at p. 586.) The court concluded that, since the police did not have a constitutional duty to perform any particular tests (citing *Arizona v. Youngblood* (1988) 488 U.S. 51, 58–59 [102 L.Ed.2d 281, 109 S.Ct. 333]), the plaintiff in *Jimenez* did not have a constitutional right to DNA testing in the pretrial stages of his criminal case. (*Jimenez, supra,* 245 F.Supp.2d at p. 588.)

In *Pennington,* the plaintiff was arrested for possession of a controlled substance. The arresting officers conducted a field test of the white powder at the station, which indicated it was cocaine. The officers then initiated the procedure to send the powder to the state police for definitive testing, but the powder was not delivered to the state lab for testing for about a month. Then, a month later, the officers picked up the laboratory test results, which identified the substance as aspirin. Another month went by before the trial court dismissed the charges against the plaintiff and ordered his release. The plaintiff then sued the police officers and the police department for, in part, over-detention in violation of substantive due process under the Fourth and Fourteenth Amendments. (*Pennington, supra,* 719 F.Supp. at p. 764.)

The court in *Pennington* acknowledged the general notion in *Baker v. McCollan, supra,* 443 U.S. at pages 145–146, that "in certain situations, prolonged pretrial detention after a valid arrest could amount to a due process violation." (*Pennington, supra,* 719 F.Supp. at p. 771.) Nonetheless, the court also observed: "The lack of relevant case law is not surprising, because the creation of a right to speedy confirmation of a probable cause determination would likely impose a continuing duty of investigation upon police officers. Such a duty would be in derogation of the principle . . . that law enforcement officers have no responsibility under the Constitution to investigate every claim of innocence [after an initial probable cause determination.]" (*Ibid.*)

The court in *Pennington* then discussed some of the limited case law, which holds that continued detention does not violate due process unless the police are actually aware of exculpatory evidence. (*Pennington, supra,* 719 F.Supp. at p. 771.) Thus, the court found that the arrestee did not have a constitutional right to a laboratory confirmation of the field test results because the police officers were not constitutionally required to obtain such information. (*Id.* at p. 777.)[2] Similarly, the Ninth Circuit in *Lee, supra,* 250 F.3d at page 683, concluded that a detainee has " 'a constitutional right to be free from continued detention [but only] after it was or should have been known that the detainee was entitled to release.' "

 In the present case, the liberty interest at stake here—the alleged constitutional right to a speedy confirmation of the officers' probable cause determination by use of laboratory testing—cannot be deemed a "fundamental" right that is "objectively, 'deeply rooted in the Nation's history and tradition.' " (*Washington, supra,* 521 U.S. at pp. 720–721.) Defendants Sauls and Blagg thus did not violate any of plaintiff's constitutional rights. Similarly, regarding the defendant County of Los Angeles, its policies, customs and practices regarding DNA testing did not deprive plaintiff of a constitutional right, or amount to "deliberate indifference" to a constitutional right in view of the undisputed testing backlog and the county's reasonable priorities for DNA testing. (See *Lee, supra,* 250 F.3d at pp. 681–682.)

Therefore, the trial court properly granted summary judgment in favor of all defendants.

---

[2] We note that plaintiff in the present case grasps at the observation by the court in *Pennington, supra,* 719 F.Supp. at page 778, that if the facts had been presented in a "tort case," rather than a substantive due process case, a jury could have found the delay in obtaining test results unreasonable and awarded monetary damages. However, in the present case, of course, no state law tort claims are at issue.

III. *Additionally, defendants Sauls and Blagg are shielded by qualified immunity from civil liability.*

■ Government employees generally are shielded by qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818 [73 L.Ed.2d 396, 102 S.Ct. 2727].) Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." (*Malley v. Briggs* (1986) 475 U.S. 335, 341 [89 L.Ed.2d 271, 106 S.Ct. 1092].)

■ To defeat a defense of qualified immunity, two factors are relevant. First, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged [must] show the officer's conduct violated a constitutional right." (*Saucier v. Katz* (2001) 533 U.S. 194, 201 [150 L.Ed.2d 272, 121 S.Ct. 2151].) Second, even if the conduct alleged is found constitutionally impermissible, the officers are nonetheless shielded from civil liability if the right was not "clearly established." (*Ibid.*) In other words, the officers' actions must violate " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " (*Hope v. Pelzer* (2002) 536 U.S. 730, 739 [153 L.Ed.2d 666, 122 S.Ct. 2508].)

Here, as discussed above, plaintiff failed to satisfy the first prong of the above analysis—the necessary prerequisite that there be some constitutional right infringed. Since there is no constitutional right—let alone, a right that is "clearly established"—to speedy laboratory testing to confirm probable cause for arrest and detention or any continuing duty of probable cause investigation, the essential requirement under the *Saucier* test is not satisfied. Thus, plaintiff's attack on delay in obtaining DNA test results cannot defeat the officers' qualified immunity from civil liability.

■ Finally, contrary to plaintiff's apparent contention, the County of Los Angeles did not assert qualified immunity on its own behalf. Indeed, the protection afforded by qualified immunity applies only to individuals, such as the officers herein, and not to municipalities. (See *Owen v. City of Independence* (1980) 445 U.S. 622, 656 [63 L.Ed.2d 673, 100 S.Ct. 1398]; *Lee, supra,* 250 F.3d at p. 680, fn. 6.)

Accordingly, the officers' qualified immunity was not defeated, and for this additional reason the trial court properly granted summary judgment against the plaintiff and in favor of defendants Sauls and Blagg.

## <u>DISPOSITION</u>

The judgment is affirmed.

Doi Todd, J., and Ashmann-Gerst, J., concurred.