Filed 4/25/16  P. v. Johnson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B260017 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA410398) |
| GREGORY ALLEN JOHNSON, | |
| Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

        David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Timothy M. Weiner and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Gregory Allen Johnson appeals a judgment after a jury convicted him of second degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] for the shooting death of Kenneth McCray. Johnson shot McCray four times in Johnson's apartment. Medical testimony established that only one of the four bullets was fatal. Johnson testified at trial that he fired the shots in self-defense, although he had previously told investigators that he fired only two shots in self-defense and had given conflicting stories about the third and fourth shots.

Johnson argues that the trial court erred in failing to instruct the jury on the lesser included offense of attempted murder and in instructing on self-defense. We conclude that, because the jury could not reasonably have found that Johnson committed only attempted murder and not murder, the trial court had no obligation to instruct on attempted murder as a lesser included offense. We also conclude that the court properly instructed the jury on self-defense. Therefore, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.     *Johnson's Acquaintance with McCray, McCray's Attempted Suicide, and the Discovery of McCray's Body*

Johnson met McCray in a residential Veterans Administration substance abuse rehabilitation program. Johnson later moved into an apartment subsidized by the VA. In September 2012 McCray asked if he could stay with Johnson temporarily, and Johnson agreed.

In November 2012 McCray locked himself in Johnson's bathroom and cut himself in an apparent suicide attempt. Johnson called the 9-1-1 emergency operator, and the

---

[1]     Statutory references are to the Penal Code.

police responded. Larry Minor, the apartment building maintenance manager, opened the bathroom door. The police found McCray in the bathroom bleeding profusely, and they called the paramedics. The paramedics took McCray to the hospital. The hospital later transferred McCray to the psychiatric ward at a VA hospital.

A week later Minor told Johnson that McCray could not return because Johnson was not allowed to have guests stay longer than 14 days in his subsidized apartment. Johnson called McCray's father in Alabama, stated that McCray was in the hospital, discussed McCray's problems with alcohol, and asked whether McCray had any family members with whom he could stay.

In February 2013 Johnson informed the VA police that McCray had left him several voicemail and text messages stating McCray was upset Johnson had thwarted his suicide attempt and threatening to kill Johnson. A VA police officer listened to some of the messages and viewed some of the texts. The officer told Johnson to secure his home, close the windows, and protect himself in any way he could.

Johnson called McCray's father in early March 2013 and stated that McCray had started drinking again and had checked himself into a VA substance abuse program. On March 31, 2013 Johnson called McCray's father again. Johnson stated that he needed to move some of McCray's belongings out of his apartment and that he would store them outside in the back of the building. McCray's father later received a shipment of McCray's belongings.

On April 3, 2013 Minor, the apartment manager Miesha Tyars, and a pest control worker visited Johnson's apartment. Minor and Tyars were responding to complaints from Johnson's downstairs neighbor about an unpleasant odor and fluid on the downstairs closet floor. Minor entered the apartment and asked Johnson what was in the closet. Johnson stated, "I got tired of his bullshit. I put him in the closet." When Minor expressed surprise and disbelief, Johnson repeated this statement. Johnson had sealed the closet door with caulk, boarded the closet shut, and removed the doorknob. Minor asked, "How long has he been in there?" Johnson responded, "30 days." Johnson stated, "The

guy killed himself, and I didn't want to get the blame for it." When Minor called 9-1-1, Johnson stated that he was going to the bank to get some money and left the apartment.

The police obtained a search warrant and found McCray's body in the closet. The body was wrapped in layers of what appeared to be an air mattress that had been cut open, carpet padding, and plastic. There were air fresheners and a box of baking soda inside the closet, and additional air fresheners elsewhere in the apartment. McCray was fully dressed except that he was not wearing shoes. He had a splint on his left wrist, and he had credit cards, an identification card, a wallet, keys, and white oblong pills in his pockets.

B.     *Johnson's Differing Accounts of the Shooting*

On April 4, 2013 the police found Johnson at the VA hospital and arrested him. In an interview with detectives at the police station that day Johnson explained how he had met McCray and offered him a place to stay, and he described McCray's attempted suicide in November 2012. In the interview, Johnson explained that in January 2013 McCray returned to Johnson's apartment, but Johnson refused to let him stay there. McCray became upset and left Johnson several threatening phone messages and texts. In mid-February 2013 McCray returned to the apartment and apologized. McCray stated that he needed a place to stay and that he would seek treatment for his substance abuse. Johnson agreed to take him in provided that McCray did not drink or use drugs. Johnson searched through McCray's belongings and found a gun, which Johnson took to keep it from McCray.

After two or three weeks Johnson's friend Jimmy gave McCray a ride to the market. McCray returned with vodka and drugs. Johnson confronted McCray, and the two argued. Johnson stated that McCray had to leave because the apartment manager had noticed McCray there. Johnson took a walk outside to calm down. After Johnson returned, the arguing continued. McCray became very upset, yelled at Johnson, stood up from the couch, and raised his right hand as if to strike Johnson. Johnson, who had the gun in the pocket of his shorts, shot McCray twice in the shoulder area. McCray sat

4

down and stated, "Why would you do that to me?"  McCray put his hand on his shoulder where he had been shot.

Johnson and McCray talked briefly.  Johnson stated, "Look.  You're gonna be alright.  I'm gonna get you some help.  It's just your shoulder."  Johnson thought he heard the police and went outside, leaving the gun behind in a kitchen drawer.  While he was outside, Johnson heard a "pop," as if McCray had shot himself.  Johnson returned to the apartment, heard a gurgling sound coming from McCray, and saw him slumped over.  Johnson soon realized that McCray was dead.  Johnson dragged McCray's body to the closet, sealed the closet, and disposed of the gun.[2]

On April 24, 2013 the police interviewed Johnson a second time.  The police told Johnson that the autopsy report showed that, contrary to the statement Johnson had made in his prior interview, McCray had not shot himself.  This time Johnson stated that he shot McCray twice in the right shoulder, and as Johnson lowered the gun, it fired again.  Johnson stated that he did not aim the third shot, but he believed the third shot struck McCray in "the gut" on his right side.  According to Johnson, McCray stated, "You asshole, you shot me," and put his hand to his shoulder.  Johnson admitted that McCray did not shoot himself.  Johnson also admitted that he had not taken the gun from McCray's belongings, but had purchased it to protect himself from McCray.  Initially during the second police interview Johnson insisted that he had fired only three shots, but he later acknowledged that he might have fired a fourth shot immediately after the third.  Johnson again stated that he went outside, and when he returned McCray made a gurgling sound and slumped over.

---

[2]    Johnson also told the detectives about a notebook in which he had described these events.  The notebook included an entry dated March 30, 2013 that was generally consistent with Johnson's statements in the police interview, but the notebook entry stated that Johnson had purchased the gun to protect himself from McCray.

5

C.    *The Trial and Verdict*

At trial the prosecutor played the audio recordings of Johnson's two police interviews, and introduced into evidence the notebook in which Johnson had written an account of the events.  The prosecutor also presented testimony by a medical examiner stating that the lack of soot and stippling on McCray's body, and other evidence, indicated that McCray's death was a homicide and that the gun had been discharged from a distance of at least 18 inches.[3]  The medical examiner found four bullets in McCray's body, but could not determine the sequence in which they had been fired.

The medical examiner identified the bullets by number and stated that bullet No. 1 entered McCray's body at the junction of the right neck and upper right torso, moved downward through soft tissue, fractured the first rib, and came to rest in the right pleural cavity.  Bullet No. 2 entered at the upper right torso, moved left to right and downward through soft tissue, and came to rest in the right chest wall.  Bullet No. 3 entered at the right chest, moved right to left and front to back through the sternum, the trachea, and the thoracic aorta before coming to rest in the upper left back.  Bullet No. 4 entered at the right chest, moved right to left and downward through soft tissue, and came to rest in the right back.  The medical examiner stated that only bullet No. 3 was fatal.

Johnson testified at trial regarding his versions of the events on February 27, 2013.  According to Johnson, at approximately 12:30 p.m. or 1:00 p.m., McCray asked Jimmy for a ride to the grocery store, and the two returned around 3:00 p.m. or 3:30 p.m.  McCray then asked Johnson about the street price of Vicodin, and McCray was upset that he had been cheated.  McCray started arguing with Jimmy, who then left.

---

[3]    The medical examiner testified, "Soot refers to burnt particles of gunpowder, which are black, typically from a handgun.  They can be seen obviously in the wound track if it is a contact wound.  Otherwise, you typically see soot from a handgun up to about 26 inches."  He stated, "Stippling refers to unburnt particles of gun powder striking the skin, creating typically red abrasions, in other words, red round little dots . . . .  Stippling is seen when the muzzle of the gun is about half an inch to about a foot and a half, occasionally two feet.  Beyond that you do not see stippling."

At approximately 6:00 p.m. McCray was still upset about the Vicodin. He was sitting on the couch drinking from a bottle of cranberry juice, but Johnson later discovered that the bottle also contained alcohol. Johnson prepared dinner in the kitchen and then went to his bedroom. At 8:30 p.m. or 9:00 p.m. McCray became loud, and Johnson suspected that McCray had consumed alcohol or taken drugs. Johnson told McCray that their living situation was unsatisfactory and that McCray had to move out. McCray became upset, and Johnson returned to his bedroom.

At approximately 11:00 p.m. Johnson awakened to the sound of loud voices in the living room. He put the gun in the pocket of his shorts because McCray was supposed to be alone in the living room. When Johnson entered the living room, he saw McCray sitting alone on the couch arguing with himself and holding the cranberry juice bottle. Realizing that McCray was drunk, Johnson tried to talk to him, but they soon argued. McCray was upset about something that had happened earlier with Jimmy and seemed to blame Johnson for what went wrong. After five or 10 minutes of loud arguing, Johnson told McCray to leave that night. McCray became very angry and asked about the money he had given Johnson for allowing him to stay in the apartment. Johnson stated that he would return some of the money and suggested that they walk to an automatic teller machine.

According to Johnson's testimony, McCray stood up, moved toward Johnson, and made a fist. McCray struck his left fist against the palm of his right hand. McCray stated, "You gray-haired mother fucker, I'll snap your neck." Johnson removed the gun from his pocket and kept it pointed toward the floor. The two continued to argue for another two minutes. Johnson stated, "Fuck it. I'll leave." McCray then ran at Johnson. Fearing for his life, Johnson shot McCray twice in the shoulder area from a distance of three to four feet. McCray kept moving toward Johnson, and so "within seconds" Johnson fired two more shots. Johnson fired the last two shots lower, striking McCray's lower abdomen area.

McCray then threw up his hands and stated, "You shot me, asshole," walked back to the couch, and sat down. Johnson heard the front gate close and thought the police had

7

arrived. When he went outside, however, the police were not there. When Johnson returned to the apartment, McCray stated, "I fucked up," looked in the direction of some vodka bottles on the floor, and went limp. Johnson sat in a chair, smoked some cigarettes, and fell asleep. The next day he put McCray's body in the closet.

After a couple of days Johnson asked a friend whether California had a self-defense law. His friend responded that it did not. Johnson asked another friend who told him the same thing. Johnson thought he was in big trouble, so he lied to the detectives in the first interview.

The trial court instructed the jury on first degree murder, second degree murder, and voluntary manslaughter. The court also instructed on self defense, including CALJIC No. 5.12.

The jury found Johnson not guilty of first degree murder and guilty of second degree murder. The jury found true the allegation that Johnson had personally and intentionally discharged a firearm in committing the murder (§ 12022.53, subd. (d)). The trial court imposed an aggregate prison term of 40 years to life.

## DISCUSSION

A.     *The Trial Court Did Not Have an Obligation To Instruct on Attempted Murder, and Any Error in Failing To Instruct Was Harmless*

A trial court has a sua sponte obligation to instruct the jury on an offense that is necessarily included in a charged offense if there is substantial evidence that the defendant committed only the lesser offense. (*People v. Smith* (2013) 57 Cal.4th 232, 239-240 (*Smith*); see *People v. Brothers* (2015) 236 Cal.App.4th 24, 29 ["[t]he trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater"].) The duty to instruct on a lesser included offense arises even if the lesser offense theory conflicts with the defendant's theory of defense. (*People v. Moye* (2009) 47 Cal.4th 537, 548-549; accord, *People v.*

8

*Millbrook* (2014) 222 Cal.App.4th 1122, 1137; see *People v. Breverman* (1998) 19 Cal.4th 142, 162-163 ["substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself"].) """Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]'" that the lesser offense, but not the greater, was committed."" (*Moye*, at p. 553.) On the other hand, a court has no obligation to instruct on a theory that has no support in the evidence. (*Smith*, at p. 240; *People v. Brown* (2016) 245 Cal.App.4th 140, 152; see *People v. Valdez* (2004) 32 Cal.4th 73, 116 ["""[s]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense"""].) We review de novo whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113; *People v. Walker* (2015) 237 Cal.App.4th 111, 115.)

The crime of attempted murder consists of an unsuccessful attempt to unlawfully kill another person with malice aforethought. (§§ 187, subd. (a), 664.) "'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1192; see § 21a.)

The trial court's failure to instruct on attempted murder was error only if attempted murder is a lesser included offense of murder, and, if so, there was substantial evidence to support a finding that Johnson committed attempted murder but not murder. (See *Smith*, *supra*, 57 Cal.4th at pp. 239-240.) Johnson cites *People v. Davidson* (2008) 159 Cal.App.4th 205 (*Davidson*) for the proposition that "attempted murder is a lesser included offense of murder." The opinion in *Davidson* does contain that sentence. (See *id.* at p. 210.) And the People, citing *Davidson,* concede that, "[b]ecause the charging document in this case did not limit the murder charge to an implied malice theory, attempted murder was a lesser included offense."

*Davidson*, however, involved very different circumstances. In that case the defendant shot the victim twice in the back of the head, paralyzing him. A jury convicted the defendant of attempted first degree murder. (*Id.* at p. 208.) After the court sentenced

9

the defendant, the victim died. The People filed a new information charging the defendant with first degree murder, and a jury convicted the defendant of that crime. The trial court then sentenced the defendant on the murder conviction and dismissed the attempted murder conviction, stating its dismissal was "'based on the continuing legal validity of the verdict and sentence in'" the murder case. (*Ibid.*) The defendant successfully appealed his murder conviction, and on remand the People were unable to proceed. (*Id.* at p. 209.) The trial court reinstated the attempted murder conviction, and the defendant appealed again. The court in *Davidson* held that trial court had authority to reinstate the dismissed judgment of conviction for attempted murder because "reinstatement of defendant's attempted murder conviction occurred as a matter of law." (*Id.* at p. 210.) It was in the context of explaining why the court had to dismiss the attempted murder conviction when sentencing the defendant on the murder conviction under section 669 that the court stated, "Attempted murder is a lesser included offense of murder."[4] (*Davidson*, at p. 210.)

*Davidson* thus involved a very different factual and procedural context. The case did not raise, and the court did not decide, whether the trial court had a sua sponte obligation to give an attempted murder instruction as a lesser included offense of murder. Indeed, the trial court in *Davidson* could not have had any such duty in the first trial because the victim had not yet died and the defendant had not been charged with murder, and the defendant did not argue in the second appeal that the trial court should have given an attempted murder instruction as a lesser included offense in the second trial. Moreover, here, unlike *Davidson*, there was no significant time period between the shooting and the death. Johnson shot McCray multiple times and killed him. *Davidson*

---

[4] Section 669, subdivision (a), provides in part: "When a person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively."

10

does not stand for the proposition that in such a situation the court must instruct the jury on attempted murder as a lesser included offense of murder.

In any event, even assuming attempted murder is a lesser included offense of murder for purposes of instructing the jury in this case, the trial court had a duty to instruct on attempted murder only if there was substantial evidence that Johnson committed attempted murder but not murder. Johnson argues that there was substantial evidence for such an instruction because Johnson consistently told the investigators (although not Minor and Tyars at the scene) and testified at trial that he feared for his life when he fired the first two shots, and the medical examiner could not determine the sequence that the bullets had been fired. Citing this evidence, Johnson argues that the jury reasonably could have concluded that he fired the first two shots, including the fatal shot, in self-defense,[5] but disbelieved Johnson's testimony that he fired the third and fourth shots in self-defense and concluded instead that, after striking McCray with the first two shots, Johnson fired the second two shots with malice after the imminent danger had passed.

Johnson's argument ignores the fact that, without exception, Johnson indicated in his various accounts of the shooting that the first two shots struck McCray in the shoulder area. There was no evidence that Johnson fired either of the first two shots into McCray's chest in self-defense. In all of his accounts of the shooting Johnson stated that he lowered his aim for the third and fourth shots. In his first police interview Johnson stated that he initially shot McCray twice in the shoulder area and that McCray then "put his hand there." In his second interview Johnson stated that the first two shots struck McCray in the shoulder. Johnson told the police investigators, "They were—I'm positive on that—were in the shoulder because I was not trying to become a killer." Johnson

---

[5]     A person who kills believing that lethal force is necessary to defend oneself against an imminent danger of death or great bodily injury danger lacks malice and cannot be guilty of murder. (See *People v. Elmore* (2014) 59 Cal.4th 121, 129-130 (*Elmore*).)

11

stated that he then pointed the gun a little lower, and the third bullet struck McCray in "the gut." Johnson wrote in his notebook, "I shot him twice in the shoulder to wound him!" And at trial Johnson testified that he initially shot McCray twice in the shoulder area. Johnson testified that he then aimed lower, striking McCray in the lower abdomen area.

Based on Johnson's accounts of the shooting, the first two shots could only correspond with bullets No. 1 and No. 2. Those two bullets struck McCray in the upper right torso area, near the right shoulder. The medical examiner determined that those shots were not fatal. Fatal bullet No. 3 and nonfatal bullet No. 4 struck lower on McCray's body, in the right chest. Because there was no evidence suggesting that either of the first two shots that Johnson purportedly fired in self-defense struck McCray below the shoulder area, there was no evidence that Johnson, in self-defense, shot McCray in the chest with fatal bullet No. 3 in one of the first two shots.[6]

Moreover, Johnson testified that he fired the third and fourth shots "within seconds" of the first two shots as McCray continued to advance toward him. This scenario did not allow for any meaningful distinction between Johnson's state of mind in firing the initial shots and his state of mind in firing the later shots. Thus, even if attempted murder is a lesser included offense of murder for purposes of instructing the jury in this case, there was no substantial evidence to support Johnson's attempted murder theory, and the trial court did not err in not instructing the jury sua sponte on attempted murder.

---

[6]  Johnson argues that in closing argument the prosecutor acknowledged it was reasonable to conclude Johnson had fired the fatal bullet first and in self-defense, but that even then Johnson was guilty of murder because he fired the subsequent shots with malice. Johnson mischaracterizes the prosecutor's argument. The prosecutor actually argued that Johnson's claim of self-defense was untrue and that the downward path within McCray's body of all bullets other than bullet No. 3 indicated that Johnson had stood above McCray and shot him while McCray was sitting on the couch. In any event, the prosecutor's statements are not evidence (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 471) and cannot support a jury finding.

B.      *The Trial Court Properly Instructed the Jury on Self-defense*

       1.      *The Instruction Did Not Violate Johnson's Fundamental Liberty Interest*

A homicide is justifiable when it is committed in self-defense, which is "when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished." (§ 197, subd. 3; see *Elmore*, *supra*, 59 Cal.4th at pp. 133-134; *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305.) Section 198 states: "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044-1045 (*Nguyen*); *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227.)

The trial court instructed the jury on self-defense with CALJIC No. 5.12. This instruction included the language: "To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone."

Johnson argued in his opening brief that the language "such fears alone" in section 198 referred to the fears of a reasonable person. He argued that section 198 precluded the justification of self-defense if the defendant's fears were unreasonable, but that the statute did not mean that those fears must have been the defendant's only motive. He argued that the contrary construction of the statute by the court in *People v. Trevino* (1988) 200 Cal.App.3d 874 (*Trevino*) unduly restricted a person's fundamental liberty interest and violated substantive due process. Johnson argued that CALJIC No. 5.12 was ambiguous and appeared to state the rule from *Trevino*, which Johnson contended was incorrect.

13

After the Supreme Court decided *Nguyen*, *supra*, 61 Cal.4th 1015, which approved the *Trevino* court's construction of section 198, Johnson filed a supplemental opening brief acknowledging that the Supreme Court had rejected his proposed interpretation of the statute. Johnson argued, however, that the Supreme Court in *Nguyen* did not address his constitutional argument. Johnson also argued that the trial court erred in failing to instruct the jury that a motive other than reasonable fear precludes self defense only if the other motive was a but-for cause and a substantial factor in his decision to use deadly force.

"[T]he United States Supreme Court's substantive due process jurisprudence 'forbids the government to infringe certain "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.' [Citation.] Substantive due process analysis begins with a '"careful description" of the asserted fundamental liberty interest.' [Citation.] This '"careful description"' must be concrete and particularized, rather than abstract and general." (*In re Lira* (2014) 58 Cal.4th 573, 585; see *Duarte Nursery, Inc. v. Cal. Grape Rootstock Improvement Commission* (2015) 239 Cal.App.4th 1000, 1010.) After identifying the specific interest at stake, the court must determine whether it is a fundamental right or liberty that is "objectively, 'deeply rooted in this Nation's history and tradition' [citations], and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [it] were sacrificed.'" (*Washington v. Glucksberg* (1997) 521 U.S. 702, 720-721.)

The United States Supreme Court "'ha[s] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' [Citation.] By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore 'exercise the utmost care whenever we are asked to break new ground in this field' . . . ." (*Washington v. Glucksberg*, *supra*, 521 U.S. at p. 720; see *District Attorney's Off. v. Osborne* (2009)

14

557 U.S. 52, 72; *People v. Uribe* (2011) 199 Cal.App.4th 836, 863; *Jimenez v. County of L.A.* (2005) 130 Cal.App.4th 133, 141.)

When considering a substantive due process claim based on an asserted fundamental liberty interest the United States Supreme Court has "formulated the interest" purportedly subject to constitutional protection with specificity. (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 940.) For example, reviewing a state statute forbidding assisted suicide, the United States Supreme Court described the due process right not as the liberty to "'determin[e] the time and manner of one's death'" or the "'liberty to choose how to die,'" but more specifically as a "'right to commit suicide which itself includes a right to assistance in doing so.'" (*Ibid.*) Similarly, in a case challenging the federal government's policy of placing deportable alien juveniles in custodial child care rather than releasing them to unrelated adults, the United States Supreme Court described the due process interest not as "'"freedom from physical restraint,"'" but more specifically as "'the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution.'" (*Ibid.*)

Johnson describes the interest he asserts broadly as the right of self-defense. The specific asserted interest is the right to use deadly force to defend oneself against an imminent danger of death or great bodily injury when a person's reasonable fear of death or great bodily injury is not the only cause of the decision to use deadly force. Johnson cites authorities recognizing the right of self-defense in connection with the Second Amendment right to bear arms (see *McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 767-768; *District of Columbia v. Heller* (2008) 554 U.S. 570, 592, 599), but he does not cite any authority that the more specific interest on which he relies is deeply rooted in the nation's history and tradition or is implicit in the concept of ordered liberty. Thus, Johnson has failed to show that the asserted interest is a fundamental liberty interest protected by substantive due process. (Cf. *People v. Santos* (2007) 147 Cal.App.4th 965, 979 [defendant failed to show that the right "to question the jury about its deliberative

15

process after the verdict" was a fundamental liberty interest]; *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 709 [plaintiff failed to show that the "right to [non-fluoridated] public drinking water" was "'explicitly or implicitly guaranteed by the Constitution'"]; *Jimenez v. County of Los Angeles*, *supra*, 130 Cal.App.4th at p. 143 ["right to a speedy confirmation of the officers' probable cause determination by use of laboratory testing" was not a fundamental liberty interest].)[7]

### 2. *Johnson Forfeited His Argument That the Trial Court's Instructions on Self-defense Were Incomplete*

Finally, Johnson contends the trial court had a sua sponte duty to instruct the jury that a motive other than reasonable fear precludes self-defense only if the other motive was a but-for cause and a substantial factor in his decision to use deadly force. The trial court instructed the jury at length on self-defense, but did not instruct on the particular distinction that Johnson now asserts. To the extent the instructions the trial court gave were incomplete, Johnson forfeited any argument that the trial court's instructions on self-defense were insufficient by failing to request clarifying language or a pinpoint instruction. (See *People v. Jones* (2013) 57 Cal.4th 899, 969 ["'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'"]; *People v. Lee* (2011) 51 Cal.4th 620, 638 ["[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"]; *People v. Jones* (2014)

---

[7] Citing *Golden v. State* (Ga. 1858) 25 Ga. 527, 532, *State v. Rapp* (Mo. 1898) 44 S.W. 270, 271, and *State v. Bowyer* (W.Va. 1957) 101 S.E.2d 243, 249, Johnson asserts that the common law rule was fear did not have to be the sole motive for a killing in self defense. These cases, however, do not state such a rule, nor do they show that the right to use deadly force in self-defense based on mixed motives is deeply rooted in the nation's history and implicit in the concept of ordered liberty.

223 Cal.App.4th 995, 1001 [failure to request a pinpoint instruction forfeits the argument on appeal].)

## DISPOSITION

The judgment is affirmed.


SEGAL, J.

We concur:


PERLUSS, P. J.


BLUMENFELD, J.[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.