Filed 6/20/19; Certified for Partial Publication 7/17/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| NANCY ORTIZ, | C081091 |
| Plaintiff and Appellant, | (Super. Ct. No. 39-2013-00298176-CU-WT-STK, STKCVUWT20130005975) |
| v. | |
| DAMERON HOSPITAL ASSOCIATION et al., | |
| Defendants and Respondents. | |

Plaintiff Nancy Ortiz brings this employment discrimination case against her former employer Dameron Hospital Association (Dameron) and former supervisor Doreen Alvarez (collectively defendants), alleging that she was discriminated against and subjected to harassment based on her national origin (Filipino) and age (over 40) at the hands of Alvarez, and that Dameron failed to take action to prevent it in violation of the California Fair Employment and Housing Act (the FEHA) (Gov. Code, § 12900 et seq.).[1]

---

[1] Undesignated statutory references are to the Government Code.

1

Ortiz claims that she was forced to resign due to the intolerable working conditions created by Alvarez in order to accomplish Alvarez's goal of getting rid of older, Filipino employees, like Ortiz, who, in Alvarez's words, "could not speak English," had "been there too long," and "ma[d]e too much money." The complaint asserts causes of action for discrimination (§ 12940, subd. (a); against Dameron), harassment (§ 12940, subd. (j); against Dameron and Alvarez), retaliation (§ 12940, subd. (h); against Dameron), failure to take all reasonable steps necessary to prevent discrimination and harassment from occurring (§ 12940, subd. (k); against Dameron), and injunctive relief (Code Civ. Proc., § 526; against Dameron).[2] The complaint also prays for punitive damages.

Defendants moved for summary judgment, or in the alternative summary adjudication. The trial court granted defendants' motion for summary judgment. The trial court found that Ortiz could not make a prima facie showing of discrimination because she cannot show that she suffered an adverse employment action, and could not make a prima facie showing of harassment because she cannot show that any of the complained of conduct was based on her national origin or age.[3] The trial court determined that the remaining causes of action as well as the claims for injunctive relief and punitive damages were derivative of the discrimination and harassment causes of action and thus had no merit.

Ortiz appeals, contending that there are triable issues of material fact as to each of her causes of action, except retaliation, and her claims for injunctive relief and punitive damages. We agree in part. We will reverse the judgment and direct the trial court to

[2]    While denominated a "cause of action" in the complaint, injunctive relief is a remedy, not a cause of action. (*McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1159.)

[3]    Ortiz did not oppose defendants' motion for summary judgment, or in the alternative summary adjudication, as to her retaliation cause of action, and the trial court entered summary judgment on that cause of action in Dameron's favor as well. Ortiz does not challenge that portion of the trial court's ruling on appeal.

vacate its order granting summary judgment and enter a new order granting summary adjudication of Ortiz's retaliation cause of action and request for punitive damages as to Dameron but denying summary adjudication of her discrimination, harassment, and failure to take necessary steps to prevent discrimination and harassment causes of action, her claim for injunctive relief, and her request for punitive damages as to Alvarez.[4]

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the evidence set forth in the papers filed in connection with the summary judgment motion, except that to which objections were properly made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) Consistent with the applicable standard of review, we summarize the evidence in the light most favorable to Ortiz, the party opposing summary judgment, resolving any doubts concerning the evidence in her favor. (*Ibid.*)

Ortiz, a registered nurse, worked for Dameron Hospital for approximately 10 years. She was born in the Philippines and immigrated to the United States. English is her second language and she speaks with a thick accent. Ortiz was over 40 years old when her employment with Dameron ended in July 2012.

In mid-2011, Alvarez became the director of the medical-surgical and telemetry departments. At the time, Ortiz was working as a unit coordinator in the medical-surgical department, overseeing the work of the other nurses, and Alvarez became her direct supervisor. Like Ortiz, the vast majority of unit coordinators in those departments were

---

[4]   This is one of six appeals pending before this court by former Dameron nursing employees who reported directly to Alvarez, alleging that they were discriminated against in violation of the FEHA. (See *Kabba v. Dameron Hospital Assn.*, C081090; *Galvan v. Dameron Hospital Assn.*, C081092; *Arimboanga v. Dameron Hospital Assn.,* C081249; *Duke v. Dameron Hospital Assn.*, C081251; *Guiao v. Dameron Hospital Assn.*, C081755.)

3

Filipino.  According to Alvarez, "It was 99 percent Filipino and one percent Japanese or Chinese."  There was also at least one unit coordinator from Africa.

Every time Alvarez met with the unit coordinators, she provided "negative feedback," and "insult[ed]," "degrade[d]," and "humiliate[d]" them.  At her first meeting with the unit coordinators, Alvarez brought the unit coordinators' personnel files to the meeting and stated that she had found "horrible" and "disgusting" things in the files.  She told them that she had already heard about them around the hospital, and that she was ready to "make a change."  She also stated that "she ha[d] eyes around the hospital" and whatever they said about her would get back to her.

Alvarez singled out unit coordinators who spoke English as a second language for criticism and often focused her comments on their accents and their supposed poor English language skills.  At one meeting, Alvarez told the unit coordinators, "I don't know how Dameron gets you guys.  Your accents are thick.  [You] don't know what [you are] doing."  She read from performance evaluations drafted by unidentified unit coordinators and criticized the drafters' grammar.  She stated that "those of you with a thick accent, those of you that cannot speak English . . . need to go back to school and learn how to read and write grammar," and that her young son could follow directions better than those unit coordinators who spoke English as a second language.  She also advised them that she was there "to clean the house."

At another meeting, Alvarez introduced a new unit coordinator who was White, and told the other unit coordinators, "She speak[s] good English.  She's well educated. She's going to do a better job [than] most of you guys here because you guys don't know how to speak English."

On at least one occasion, Alvarez specifically stated that the "Filipino unit coordinators" did not speak English well, could not formulate a sentence, and had poor grammar.  She also stated that "she was tired of attending meetings where Filipinos and minority workers over 40 were present."

4

At one point, Alvarez told the unit coordinators that they could "step down, step up or step out," and handed them job openings in other departments.

Ortiz had face-to-face interactions with Alvarez during her annual evaluations, at staff and unit coordinator meetings, during a meeting with Alvarez and clinical manager Bassey Duke, and during a meeting with Alvarez and another nurse in the medical-surgical department.

Duke worked with Ortiz and reported to Alvarez. During his 14-month tenure at Dameron, Alvarez repeatedly told him that the Filipino unit coordinators were "too old and had been there too long." She said that "the unit coordinators are old dummies and they don't speak English and I want to get rid of all of them." She complained that "[t]hese old Filipinos are making way too much money," and noted that they made "much more" money than she did. She also spoke to Duke about the need to "get[] lean" in order to facilitate a merger between Dameron and the University of California Davis Medical Center. At some point, Alvarez provided Duke with the names of unit coordinators she wanted to get rid of, including Ortiz, because they were "dumb," "didn't speak English," didn't represent the face of U.C. Davis," and "ma[d]e too much money."

Alvarez told Roman Roxas, a manager at Dameron with whom she shared an office, that the Filipinos are "stupid" and said, "I don't even know what they are saying half the time," and "I don't even know how they got the job speaking the way they do."

In November 2011, while Ortiz was on vacation, Alvarez transferred her to the orthopedic department, where Ortiz had little to no experience. Nurses in the orthopedic department cared for different kinds of patients and used different equipment than nurses in the medical-surgical department. Ortiz was not given any orientation or training when she was transferred. Alvarez told Ortiz that she could handle the new job. Privately, Alvarez told Duke that she knew Ortiz "would not make it there."

On July 24, 2012, Ortiz received her annual performance evaluation from Alvarez, the first since her involuntary transfer to the orthopedic department. On a scale of 1 to 5,

5

Ortiz's overall rating was "2.73," below the "3" that would indicate a satisfactory performance. A performance rating below "3" required that the employee be given a "Performance Improvement Plan." The performance improvement plan Alvarez provided to Ortiz listed two "substandard performance issues." The first was Ortiz's failure to attend a unit coordinator meeting and having her cell phone ring during a staff meeting. Ortiz missed the unit coordinator meeting in question because she was in the Philippines for her mother's funeral. Alvarez had approved Ortiz's leave and thus knew she would not be at the meeting. The second issue was that Ortiz was not a resource for the nursing staff and had "not accepted the training/help when offered to her." The charge that Ortiz was not a resource for the nursing staff was based on the complaint of one nurse that Ortiz was not available to nurses "out on the unit." Alvarez did not attempt to confirm the charge, and Ortiz denied it. The charge that Ortiz had not accepted training or help offered to her referred to her failure to attend an optional training that was scheduled when Ortiz was working and thus could not attend.

At this same meeting, Alvarez told Ortiz that she had been observed sleeping on the job but did not tell her who had seen her. Ortiz denied the accusation. "[S]leeping or apparent sleeping while on the job during work hours" was a terminable offense, and Alvarez advised Ortiz that she likely would be fired. According to Duke, Alvarez pressured him to say that he had seen Ortiz sleeping so that Alvarez could "go ahead and fire her," but he refused "to lie about" something he "did not observe" and was subsequently terminated. After his termination, Duke told Ortiz and several other unit coordinators about Alvarez's desire "to get rid of the minority nurses over 40 years old at Dameron, especially the Filipino nurses whom she specifically expressed hatred towards." At the end of the July 24th meeting, Alvarez informed Ortiz that she intended to report these performance issues to Maria Junez, Dameron's human resources director, and Janine Hawkins, Dameron's chief nursing officer/vice president.

6

Ortiz resigned the next day. After meeting with Alvarez, Ortiz felt like she was about to have a mental breakdown from all the stress. She was very upset by the poor evaluation and the performance improvement plan; however, the false accusation that she was sleeping on the job was the final straw. Ortiz felt that she had no choice but to resign "because of the stress and anxiety [she] was suffering and because [she] did not want to have a termination on [her] record." She believed that she would be terminated because of the poor evaluation "and everything else that was going on."

## DISCUSSION

A motion for summary judgment must be granted if the submitted papers show there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The moving party initially bears the burden of making a "prima facie showing of the nonexistence of any genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) As applicable here, a defendant moving for summary judgment can meet its burden of showing that a cause of action has no merit by showing that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has met its burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to the cause of action. (*Ibid.*)

We review de novo the record and the determination of the trial court. First, we identify the issues raised by the pleadings, since it is those allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts negating the opponent's claims and justifying a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the final step is to determine whether the opposition demonstrates the existence of a triable,

7

material issue of fact.  (*Barclay v. Jesse M. Lange Distributor, Inc.* (2005) 129 Cal.App.4th 281, 290.)

## I

### The Trial Court Erred in Granting Summary Judgment on Ortiz's Discrimination Cause of Action

Under the FEHA, it is unlawful for an employer, because of a protected classification, to discriminate against an employee "in compensation or in terms, conditions, or privileges of employment."  (§ 12940, subd. (a).)  To state a prima facie case for discrimination in violation of the FEHA, a plaintiff must establish that (1) she was a member of a protected class, (2) she was performing competently in the position she held, (3) she suffered an adverse employment action, and (4) some other circumstance suggests discriminatory motive.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.)  Once an employee establishes a prima facie case, a presumption of discrimination arises, and the employer is required to offer a legitimate, nondiscriminatory reason for the adverse employment action.  (*Id.* at p. 356.)  If the employer produces a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops out of the picture, and the burden shifts back to the employee "to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive."  (*Ibid.*)

This framework is modified in the summary judgment context:  " '[T]he employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' "  (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861.)  "If the employer meets its initial burden, the burden shifts to the employee to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a

8

reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Ibid.*)

Here, the trial court determined that Ortiz could not establish the third (adverse employment action) or fourth (discriminatory motive) elements of a prima facie case of discrimination. The trial court found that "[s]ince Dameron was not aware of any issues regarding Alvarez prior to [Ortiz's] resignation, and Dameron engaged in no conduct in regards to [Ortiz's] resignation, [Ortiz] cannot establish she was constructively terminated and therefore suffered an adverse employment action." The court also determined that "[t]here is simply no nexus between Alvarez's alleged discriminatory conduct and Dameron's (non) actions." On appeal, Ortiz argues that the trial court erred in granting summary judgment on her discrimination cause of action because "[t]here are disputed factual issues about whether [she] was constructively discharged," and Alvarez's discriminatory animus is attributable to Dameron. We agree.[5]

A.     *Ortiz Presented Sufficient Evidence to Allow a Reasonable Trier of Fact to Find That She Was Constructively Discharged*

"In an attempt to avoid liability [for wrongfully discharging an employee], an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment. [¶] . . . [¶] Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing

---

**5**     We shall assume for purposes of appeal that defendants presented admissible evidence showing either that one or more elements of Ortiz's prima facie case is lacking. (*Serri v. Santa Clara University, supra,* 226 Cal.App.4th at p. 861.)

9

rather than a resignation. [Citation.]" (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1244-1245 (*Turner*).)

"In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. [¶] For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner, supra,* 7 Cal.4th at p. 1251.)

"In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra,* 7 Cal.4th at p. 1247, fn. omitted.)

Contrary to the trial court's ruling and defendants' assertion on appeal, Ortiz was not required to show that Dameron knew of Alvarez's conduct prior to Ortiz's resignation in order to establish she was constructively discharged. In *Turner,* the court made plain that an employee seeking to establish a constructive discharge must show that the employer *either* intentionally created *or* knowingly permitted the intolerable working conditions, and that the intent or knowledge must exist on the part of the employer *or those persons who effectively represent the employer, including supervisory employees*. (*Turner, supra*, 7 Cal.4th at p. 1251.) Here, Ortiz presented evidence that Alvarez, a supervisory employee, intentionally created the working conditions at issue in this case, and that a reasonable person faced with those conditions would have felt compelled to resign.

Alvarez's status as a supervisory employee is undisputed. The FEHA defines "supervisor" as "any individual having the authority . . . to . . . transfer, suspend, . . .

10

promote, discharge, assign, reward or discipline other employees, . . . or effectively to recommend that action . . . ." (§ 12926, subd. (t).) As the director of the medical-surgical and telemetry departments, Alvarez had such authority. As for the working conditions, Ortiz presented evidence that Alvarez consistently demeaned Ortiz and the other unit coordinators, the vast majority of whom were Filipino, accusing those with thick accents of not being able to speak English, telling them that they did not know what they were doing and that they needed to go back to school, and comparing them unfavorably to her young son. She singled out the Filipino unit coordinators for criticism, telling them that they did not speak English well, could not formulate a sentence, and had poor grammar. She also said that "she was tired of attending meetings where Filipinos and minority workers over 40 were present." In addition, Alvarez involuntarily transferred Ortiz to a unit where she had little or no experience and failed to provide Ortiz with any training, knowing she would likely fail, and falsely accused her of sleeping on the job, a terminable offense. Based on the evidence presented, a reasonable trier of fact could conclude that Ortiz's working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign.[6]

B.    *Ortiz Presented Sufficient Evidence to Allow a Reasonable Trier of Fact to Find That Alvarez Acted With a Discriminatory Motive, and That There Was a Nexus Between Alvarez's Conduct and Ortiz's Protected Status*

Ortiz presented ample evidence that Alvarez acted with a discriminatory motive, and that there was a nexus between Ortiz's protected status and Alvarez's actions. Alvarez focused her criticisms on the unit coordinators' accents and supposed poor English language skills. Discrimination on the basis of an employee's foreign accent is a

---

[6]    Because we conclude that Ortiz presented evidence sufficient to raise a triable issue as to whether she was constructively discharged, we need not consider her alternative argument that the evidence showed that she suffered an adverse employment action even if she was not constructively discharged.

11

sufficient basis for finding national origin discrimination. (*Fragante v. Honolulu* (9th Cir. 1989) 888 F.2d 591, 595; *Berke v. Ohio Dept. of Public Welfare* (6th Cir. 1980) 628 F.2d 980, 981.) Indeed, the Equal Employment Opportunity Commission Guidelines currently "define[] national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or *linguistic characteristics* of a national origin group." (29 C.F.R. § 1606.1 (2019), italics added.) Ortiz also presented evidence that Alvarez said that "she was tired of attending meetings where Filipinos and minority workers over 40 were present" and made disparaging statements about Filipino unit coordinators to Roxas and Duke. Alvarez told Roxas that the Filipino unit coordinators were "stupid," she could not understand what they were saying, and did not know how they got their jobs "speaking the way they do." She told Duke that the Filipino unit coordinators were "too old and had been there too long," and that she wanted to get rid of the Filipino unit coordinators, including Ortiz, because they were "dumb," "didn't speak English," "didn't represent the face of U.C. Davis," and "ma[de] too much money."

To the extent the trial court found that Ortiz must show that Dameron, as opposed to Alvarez, acted with a discriminatory motive, it erred. The trial court ruled that Ortiz could not show that *Dameron's* discriminatory animus contributed to Ortiz's resignation because "*Dameron* engaged in no conduct in regards to [Ortiz's] resignation," and "[t]here is simply no nexus between Alvarez's alleged discriminatory conduct and *Dameron's* (non) actions." (Italics added.) The FEHA's statutory definition of "employer" includes "persons acting as an agent of an employer." (§ 12926, subd. (d).) This definition was intended "to ensure that *employers* will be held liable if their supervisory employees take actions later found discriminatory." (*Reno v. Baird* (1998) 18 Cal.4th 640, 647.) As previously discussed, Alvarez is a supervisory employee. Moreover, where, as here, the adverse action is a constructive discharge that is alleged to

12

have resulted from the intentional acts of a supervisory employee, it is the discriminatory intent of the supervisory employee that is at issue. (*Turner, supra,* 7 Cal.4th at p. 1251.)

For all the foregoing reasons, the trial court erred in granting summary judgment on Ortiz's discrimination cause of action.

## II

## The Trial Court Erred in Granting Summary Judgment on Ortiz's Harassment/Hostile Work Environment Cause of Action

Under the FEHA, it is unlawful "[f]or an employer . . . or any other person, because of . . . national origin . . . [or] age . . . to harass an employee . . . ." (§ 12940, subd. (j)(1).) To establish a prima facie case of a hostile work environment, Ortiz must show that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected status; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) defendants are liable for the harassment. (*Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 876.) The trial court ruled that Ortiz could not establish a claim for harassment because there was nothing to indicate that Alvarez's actions were based on Ortiz's race or age. On appeal, Ortiz contends that "[t]here are disputed factual issues about whether Alvarez harassed [her] and others because of their national origin and age." We agree.

A. *Ortiz Presented Sufficient Evidence to Allow a Reasonable Trier of Fact to Find That She Was Subjected to Unwelcome Harassment Based on Her National Origin and Age*

Ortiz presented evidence that Alvarez consistently criticized the unit coordinators' accents and assumed, based on their accents, that they could not speak English and did not know what they were doing. Ortiz also presented evidence that Alvarez transferred her to a unit where she had little or no experience and provided her with no training knowing that she would fail, falsely accused her of sleeping on the job, a terminable

13

offense, and told her she would likely be fired.**7** While evidence of the transfer and accusation alone does not establish that such acts were based on Ortiz's race or age, Alvarez's statements to Roxas and Duke provide sufficient evidence from which a reasonable trier of fact could infer that that they were. As detailed above, Alvarez told Roxas that the Filipino unit coordinators were "stupid" and that she did not "even know how they got the job speaking the way they do." In conversations with Duke, Alvarez referred to the Filipino unit coordinators as "too old" and said she wanted to get rid of them because they were "dummies," and "didn't speak English." She also told Duke that she wanted to get rid of a number of unit coordinators, including Ortiz, because they were "dumb," "didn't speak English," didn't represent the face of U.C. Davis," and "ma[d]e too much money." These statements are evidence of a discriminatory animus toward the older, Filipino unit coordinators.

B. *Ortiz Presented Sufficient Evidence to Allow a Reasonable Trier of Fact to Find That the Harassment Was Severe or Pervasive*

Defendants assert on appeal that the conduct complained of by Ortiz is not sufficiently severe or pervasive to support a claim of harassment. Defendants are mistaken. "[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [protected status]." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.) "[H]arassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct

---

**7** Contrary to the trial court's finding, Ortiz's belief that she would be fired was not based on her own speculation. Ortiz could reasonably infer from the circumstances that she would likely be fired. Moreover, Alvarez testified at deposition that she told Ortiz that she likely would be fired or words to that effect.

14

sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being." (§ 12923, subd. (a); see also *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 26 (conc. opn. of Ginsburg, J.).) "A single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." (§ 12923, subd. (b).) "The existence of a hostile work environment depends upon the totality of the circumstances and a discriminatory remark, even if not made directly in the context of an employment decision or uttered by a nondecisionmaker, may be relevant, circumstantial evidence of discrimination." (§ 12923, subd. (c).) "The harassment must satisfy an objective and a subjective standard. ' "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' . . . " ' (*Miller v. Department of Corrections*, *supra*, 36 Cal.4th at p. 462.) And, subjectively, an employee must perceive the work environment to be hostile. [Citation.] Put another way, '[t]he plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that [she] was actually offended.' [Citation.]" (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 588.)

We have already concluded, *ante*, that Ortiz presented evidence that would allow a reasonable trier of fact to conclude that her working conditions were so intolerable that a reasonable person in her position would have felt compelled to resign. We do not dispute defendants' suggestion that simply requesting unit coordinators to use proper grammar in performance evaluations constitutes the "lawful 'exercise of personnel management authority properly delegated by an employer to a supervisory employee.' " As detailed

above, however, Alvarez's comments went far beyond simply requesting unit coordinators to use proper grammar when completing performance evaluations. Moreover, the complained of conduct was not limited to Alvarez's conduct at the unit coordinator meetings, but included involuntarily transferring Ortiz to a unit where she had little or no experience without providing her with any training, and falsely accusing her of sleeping on the job, a terminable offense. Based on the evidence presented, a reasonable trier of fact could conclude that the conduct complained of was sufficiently severe or pervasive to interfere with a reasonable employee's work performance and seriously affect the psychological well-being of a reasonable employee.

Accordingly, the trial court erred in granting summary judgment on Ortiz's harassment cause of action.

III

The Trial Court Erred in Granting Summary Judgment on Ortiz's Failure to Take Necessary Steps to Prevent Harassment and Discrimination Cause of Action

Under the FEHA, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) The trial court granted summary judgment on Ortiz's failure to take necessary steps to prevent harassment and discrimination cause of action on the ground that no such action lies if no harassment or discrimination has occurred. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 ["Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented"]; see also Cal. Code Regs., tit. 2, § 11023, subd. (a)(2).) As detailed above, we conclude that Ortiz submitted evidence sufficient to create a triable issue of material fact as to whether harassment and discrimination occurred. Thus, the basis for the trial court's ruling is no longer valid.

It is well settled, however, that on appeal following summary judgment, the trial court's reasoning is irrelevant, and the matter is reviewed on appeal de novo. (*Jimenez v.*

16

*County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)  "We exercise our independent judgment as to the legal effect of the undisputed facts [citation] and must affirm on any ground supported by the record."  (*Ibid.*)  Defendants contend that summary judgment was properly granted on the failure to take necessary steps to prevent harassment and discrimination cause of action because "Dameron submitted evidence of its efforts to curb harassment and discrimination."  In support of their contention, defendants assert: "Ortiz received copies of Dameron's Employee Handbook, which contained its anti-discrimination and antiharassment policies.  Dameron's Corporate Compliance Code of Conduct contains guidelines and a hotline for reporting suspected unlawful activity and its commitment to maintain a work environment free from discrimination.  Dameron further posted anti-discrimination and retaliation posters required by the FEHA in conspicuous locations."

Determining whether an employer has complied with section 12940, subdivision (k) includes an individualized assessment based on numerous factors such as workforce size, budget, and nature of its business, as well as the facts of a particular case.  (Cal. Code Regs., tit. 2, § 11023, subd. (a)(1).)  Defendants' evidence, while relevant, fails to show that Ortiz's failure to prevent discrimination and harassment cause of action has no merit.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Accordingly, the trial court erred in granting summary judgment on this cause of action.

IV

The Trial Court Erred in Granting Summary Judgment on Ortiz's Claim for
Injunctive Relief

The trial court granted summary judgment on Ortiz's claim for injunctive relief on the ground that it was "derivative of her other causes of action," which the court ruled could not survive summary judgment.  On appeal, Ortiz contends that "[s]ince the underlying causes of action should have survived, so must the claim for injunctive relief." We agree.

17

Defendants contend that the trial court properly granted summary judgment on Ortiz's claim for injunctive relief because the "FEHA provides adequate legal remedies." Defendants fail to cite any authority in support of their assertion, and to the extent defendants assert that injunctive relief is not available in actions brought under the FEHA, our Supreme Court has concluded otherwise. " '[U]pon a finding of unlawful discrimination, a court may grant injunctive relief where appropriate to stop discriminatory practices.' " (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 234.)

Accordingly, we conclude that the trial court erred in granting summary judgment on the injunctive relief cause of action.

V

Summary Judgment Was Properly Entered on Ortiz's Claim for Punitive Damages as to Dameron But Not as to Alvarez

Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to actual damages, may recover damages for the sake of example and by way of punishing the defendant." Subdivision (b) of that section states: "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her in conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. *With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.*" (Italics added.) A managing agent is "someone who exercises substantial discretionary authority over decisions that ultimately determine corporate policy." (*White v. Ultramar* (1999) 21 Cal.4th 563, 573 (*White*).)

18

Here, the trial court determined that "[s]ince none of [Ortiz's] causes of action survive this motion, she will not be able to prove or receive actual damages," so punitive damages are likewise unavailable. We have concluded that a number of Ortiz's causes of action shall survive summary judgment, including her discrimination, and harassment causes of action. Accordingly, the basis for the trial court's ruling is no longer valid. As detailed above, however, we may affirm on any ground supported by the record. (*Jimenez v. County of Los Angeles, supra,* 130 Cal.App.4th at p. 140.)

Defendants argued below that summary judgment of Ortiz's request for punitive damages is appropriate because "none of the alleged wrongdoers named in [Ortiz's] complaint were managing agents for Defendant [Dameron]." Among other things, defendants presented evidence that neither Alvarez nor Junez "autonomously set policy for Dameron Hospital Association," Alvarez did not "exercise substantial independent authority over a significant portion of [Dameron's] business," and Junez "only exercises discretion and authority within Human Resources under the oversight of the Vice-President of Human Resources." In response, Ortiz failed to point to any evidence that would support a finding that Alvarez or Junez were managing agents. Rather, Ortiz asserted that "[w]hether Ms. Alvarez's level of authority raises to the level of managing agent or that her conduct was ratified by Defendant, for purposes of punitive damages, is for a jury to determine based on the facts." In the context of a summary judgment motion, where, as here, the defendant made a prima facie showing that the plaintiff cannot establish an element of the cause of action, Ortiz was required to produce evidence sufficient to create a triable issue of material fact. She failed to do so.

As for Junez, Ortiz cited to Junez's "overall role in terminations, investigations and oversight." Such evidence is insufficient to create a triable issue on whether Junez

19

was a managing agent.[8] "[S]upervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under [Civil Code] section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White, supra,* 21 Cal.4th at p. 577.) Ortiz failed to produce evidence that would allow a reasonable trier of fact to conclude that Junez exercised such authority.

For the reasons stated above, summary judgment was properly entered on the request for punitive damages as to Dameron. The complaint, however, also seeks punitive damages from Alvarez, who is named as a defendant in the harassment cause of action. Alvarez may be liable for punitive damages if it is "proven by clear and convincing evidence that [she] has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) " 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) On the record before us, we have no trouble concluding that Ortiz presented sufficient evidence to raise a triable issue of fact as to whether Alvarez acted with malice. Based on the evidence presented, a jury could find that Alvarez's conduct was despicable and carried out with a willful and conscious disregard for the rights of

---

[8]     Ortiz also asserted generally that "Junez testified to her direct involvement in drafting policies and procedures." The evidence cited, however, does not support her assertion. In any event, having direct involvement in drafting unspecified policies and procedures is insufficient to show that someone is a managing agent. (*White, supra,* 21 Cal.4th at pp. 573, 577.)

20

others, including Ortiz. Accordingly, summary judgment was not properly entered on the request for punitive damages as to Alvarez.

VI

The Trial Court Abused Its Discretion in Sustaining Certain Objections to
Ortiz's Evidence

The trial court sustained without explanation 58 of defendants' 106 objections to Ortiz's evidence. On appeal, Ortiz challenges the trial court rulings as to 23 of defendants' objections. We shall limit our review to those evidentiary rulings that pertain to evidence that is material to our resolution of the issues raised on appeal. We review the trial court's evidentiary rulings for an abuse of discretion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)

The trial court sustained defendants' objection No. 8 to paragraph 12 of Ortiz's declaration, which states: "The fact that I cared for [orthopedic] patients in such a limited capacity would not suffice for the training or orientation necessary to work in the ortho[pedic] department as ortho[pedic] nurses have completely different types of patients and use different machinery than med[ical]/surg[ical] nurses." Defendants objected to this paragraph on relevance grounds, asserting that Ortiz "quit her job at Dameron in order to avoid termination." They also claimed that "[t]his testimony lacks the requisite foundation that training or orientation would have helped." Ortiz's statement is relevant to the issue of whether she was properly prepared for the position to which she was transferred, which in turn is relevant to the issue of whether Alvarez's act of involuntarily transferring her to the orthopedic department contributed to Ortiz's resignation and/or the creation of a hostile work environment. Ortiz testified that she believed she was terminated because of the poor evaluation "and everything else that was going on." Given the evidence presented, a jury reasonably could infer that "everything else" included the involuntary transfer to the orthopedic department. Moreover, having worked in both the orthopedic and medical-surgical departments, Ortiz would have

21

reason to know whether the types of patients and machinery differed, and whether she was adequately prepared for the position to which she was transferred. The trial court abused its discretion in sustaining defendants' objection to this evidence.

The trial court sustained defendants' objection No. 16 to paragraph 22 of Ortiz's declaration, in which she states that she resigned "because of the stress and anxiety I was suffering and because I did not want to have a termination on my record." Defendants objected to this statement as "improper opinion evidence" because it constituted a "medical conclusion" that Ortiz is not qualified to make. This objection is frivolous. Ortiz, a registered nurse, is qualified to testify that she experienced stress and anxiety. The trial court abused its discretion in sustaining this objection.

The trial court sustained defendants' objection No. 38 to paragraph 24 of Roxas's declaration, which states: "I heard Doreen say in a derogatory manner 'I don't even know what they [Filipino employees] are saying half the time' and 'I don't know how they got the job speaking the way they do.' " Defendants objected to this testimony on hearsay, relevance, and foundational grounds. This testimony is not hearsay because it was not offered for the truth of the matter asserted, i.e., that Alvarez did not actually know what the Filipino employees were saying or how they got their jobs, but rather to show discriminatory animus. (Evid. Code, § 1200.) In any event, the statement would not be made inadmissible by the hearsay rule because it is being offered against the declarant (Alvarez) in an action to which she is a party. (Evid. Code, § 1220.) Whether Alvarez's conduct was motivated by a discriminatory animus is relevant to Ortiz's discrimination and harassment causes of action. To the extent that Roxas is repeating what he heard, we fail to see how it lacks foundation. The trial court abused its discretion in sustaining defendants' objection to this evidence.

Finally, the trial court sustained defendants' objection No. 76 to Duke's deposition testimony that Alvarez asked him to tell her that he saw Ortiz sleeping so that Alvarez could "go ahead and fire her." Defendant's objected on hearsay and relevance grounds.

22

This testimony is relevant to the issue of whether Alvarez falsely accused Ortiz of sleeping on the job, which in turn is relevant to the issue of whether Alvarez was coerced into resigning and/or was subjected to a hostile work environment. This testimony is not made inadmissible by the hearsay rule because it is being offered against the declarant (Alvarez) in an action to which she is a party. (Evid. Code, § 1220.) Accordingly, the trial court abused its discretion in sustaining defendants' objection to this evidence.

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to vacate its order granting the motion for summary judgment and to enter a new order granting the motion for summary adjudication as to the retaliation cause of action and the claim for punitive damages as to Dameron, but denying the motion for summary adjudication as to the discrimination, harassment, and failure to take necessary steps to prevent discrimination and harassment causes of action, the claim for injunctive relief, and the request for punitive damages as to Alvarez. In light of our rulings in this and several other appeals by former Dameron nursing employees who reported directly to Alvarez, we further direct the trial court to reassign this matter to a different judge. Ortiz shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

                                            /s/

                                      BLEASE, Acting P. J.

We concur:

       /s/

ROBIE, J.

       /s/

DUARTE, J.

23

Filed 7/17/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| NANCY ORTIZ, | C081091 |
| Plaintiff and Appellant, | (Super. Ct. No. 39201300298176CUWTSTK, STKCVUWT20130005975) |
| v. | |
| DAMERON HOSPITAL ASSOCIATION et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed June 20, 2019, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III to V of the Discussion.

1

APPEAL from a judgment of the Superior Court of San Joaquin County, Carter P. Holly, Judge.  Reversed.

Law Offices of Ellen Lake and Ellen Lake; Bohbot & Riles and Karine Bohbot for Plaintiff and Appellant.

Kennaday Leavitt Owensby, Jeffery Owensby, Warren F. Hodges for Defendants and Respondents.

BY THE COURT:


_____/s/_____
BLEASE, Acting P. J.


_____/s/_____
ROBIE, J.


_____/s/_____
DUARTE, J.