Filed 5/27/26  Long v. Hemet Unified School Dist. CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| TORI LONG, | D085443 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. MCC2001964) |
| HEMET UNIFIED SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Riverside County, Raquel A. Marquez, Judge.  Reversed and remanded.

Finkel Firm and Sheryl L. Marx; The Cowan Law Firm and Jeffrey W. Cowan, for Plaintiff and Appellant.

Walsh & Associates, Dennis J. Walsh and Robert Kostrenich; Pollak, Vida & Barer, Daniel P. Barer and Hamed A. Ghaemmaghami, for Defendant and Respondent.

Tori Long appeals from the summary judgment entered against her in the lawsuit she filed against Hemet Unified School District (the District), where she was previously employed as a physical education and dance

teacher. Based on the District's treatment of her as a transgender person, Long's lawsuit alleged several causes of action under the Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12900 et seq.).

Long contends that the trial court erred in granting summary judgment, and that, at a minimum, it should have granted her leave to file a third amended complaint to conform her allegations to the evidence she presented in opposition to the District's motion for summary judgment.

We conclude that the trial court erred in granting summary judgment on the first cause of action for discrimination in violation of FEHA (§ 12940, subd. (a)) as to Long's claim that the District constructively discharged her when it allegedly re-affirmed its policy excluding her from the locker rooms. Further, the trial court erred in granting summary judgment on the fifth cause of action for failure to prevent discrimination in violation of FEHA (§ 12940, subd. (k)) because Long still has a viable underlying claim for discrimination and because the District has not otherwise established that it has taken all reasonable steps to prevent discrimination from occurring. Accordingly, we reverse the judgment and remand for further proceedings on those causes of action.

I.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Long's Employment With the District*

Long was hired by the District as a physical education and dance teacher at Hemet High School in 2013. At that time, Long presented as male while at work. In April 2016, Long separately met with Hemet High School principal Emily Shaw and the District's Deputy Superintendent overseeing

---

[1]    Unless otherwise indicated, all further statutory references are to the Government Code.

2

human resources, LaFaye Platter, to inform them of Long's plan to transition to female after the end of the 2015–2016 school year.

The customary practice at the school was for male physical education teachers to supervise the boys' locker room, and female physical education teachers to supervise the girls' locker room. Long had responsibilities for the boys' locker room during the 2015–2016 school year. After Long met with Principal Shaw on April 4, 2016, but before Long met with Deputy Superintendent Platter, Shaw sent an email to Platter and other human resources administrators at the District informing them of Long's planned transition and observing that a nearby school district had recently dealt with the transition of a transgender teacher. Shaw's email stated, "With [Long] being in a position of supervision over female/male students in the locker-room I believe it is a touchier subject. [¶] Since this is uncharted territory for [Hemet Unified School District] how would you like me to proceed?"

Long then met with Platter on April 6, 2016. According to Long's deposition testimony, Platter told Long "that [Long] will not be allowed into the male or female locker rooms, period." Moreover, as Long stated in her declaration, Platter explained that the decision was based on Long's transgender status. Long testified during her deposition that she felt there was nothing she could do about Platter's directive, but she did not complain at the time because she was afraid to do so.

According to Shaw, Platter subsequently informed her that Long and Platter had "mutually agreed that [Long] would not supervise in the locker room." Shaw understood this to mean that although Long would no longer be assigned to supervise students in the locker rooms, Long could still enter the locker rooms when students were not present.

3

According to Long, her exclusion from the locker rooms during school hours impacted her in multiple ways. First, she could not access the equipment stored in the locker rooms, even though, as chair of the physical education department, Long had responsibility for that equipment. As a result, Long would arrive early at school to access the equipment, and at times she would have to ask a student to obtain or return equipment for her, which was humiliating. Second, there were faculty offices inside the locker rooms, with a faculty bathroom inside those offices. As a consequence of the District's policy preventing Long from entering the locker rooms during school hours, Long could not access the bathrooms there.[2] According to Long's declaration, because she could not access the locker-room bathrooms "[o]n one occasion (in about 2018), I soiled myself because I could not get to a bathroom far away in time."

At some point over the next three years, after Long had transitioned to presenting as female, she took it upon herself to ignore Platter's directive and

[2] Referring to it as an "Apartheid" bathroom policy, Long contends in her briefing on appeal that she was limited to using only a single specially designated bathroom at the school. Among several examples, Long asserts that the District "banned Ms. Long . . . from using every other restroom available to other (non-transgender) faculty except a single bathroom across the campus—that [the District] designated for the use of Ms. Long alone." She further contends "[the District's] 'Apartheid' bathroom policy . . . forbade Ms. Long from using all ladies bathrooms except for one assigned solely to her." The record does not bear out these claims. Undisputed evidence shows that because Long was precluded from supervising in the locker rooms, she could not use the staff restroom located within the locker rooms. The record further shows that because Long was a dance teacher who taught many of her classes in the dance studio, at Long's request in June 2016, a male-gendered bathroom near the dance studio was converted into a locked gender-neutral staff bathroom that could be used by any staff member with a key, including Long. However, nothing in the record suggests that Long was limited to using only that specific bathroom at the school.

4

to start supervising students in the girls' locker room.[3] The record contains only sparse information about when Long started once again entering the locker rooms while students were present. According to Shaw, as of October 31, 2019, she was not aware that Long had resumed the activity of locker room supervision.

In the fall of 2019, school staff became aware that because physical education classes ended early so that students could change clothes, there was a growing problem with some students from physical education classes leaving the locker room area and causing disruptions in other areas of the school prior to the end of the class period. To address that problem, Shaw decided that for the last few minutes of each class period, a staff member should be assigned to supervise the "commons door" that led from the physical education area to the main part of the school campus. According to Shaw, based on her belief that Long was not providing supervision in the locker rooms as a result of Platter's 2016 directive, she chose Long as the teacher for that assignment.

The decision to assign Long to supervise the commons door was communicated to Long on October 31, 2019, in an email by assistant principal La Price Sanford. Sanford told Long, "It was decided that since you don't have to supervise either locker room, that you supervise the door going into the commons." Sanford further told Long she should "work with the PE staff to make sure that they supervise students with all due diligence and if there are students in the PE areas that should not be to have the teachers radio to either an administrator or campus supervisors for assistance." Long replied

---

[3]    Platter retired from her position in 2017. The record does not reflect whether that fact had any impact on Long's decision to resume the activity of locker room supervision.

to Sanford, stating "I'm so confused" and asking if Sanford could immediately come speak with her. According to Sanford's description of the ensuing conversation, she told Long "that under direction from Dr. Shaw to tell her that she couldn't supervise the locker room." As Long stated in her declaration, "Assistant Principal Sanford told me that she talked to Principal Shaw and that Principal Shaw said that *I was not allowed to go into the locker room* and that I would be forced to monitor the common area where the security guards usually monitored." (Italics added.)

Later that same day, Long sent an email to Sanford and Shaw. In that email, Long provided details about her daily schedule, including that she was supervising the girls' locker room during first and fifth period. Long also stated, "I'm not sure who told you that I do not supervise the girls locker room—and this is not my first year doing it. Someone is sadly, misinformed. Are you asking me not to help Marie in the mornings now and aid staff during 5th period—when everyone [*sic*] PE teacher is on duty? I honestly do not support that. But I will do what you all believe is necessary. I strongly believe someone has jumped to conclusions, instead of just meeting with me before a decision was made. I am approachable and will do whatever it takes to support staff and students. And please tell me why I don't have to supervise the girls locker room?"

A few minutes after sending that email, Long sent a text message to Shaw. The text stated, "I am very disappointed in the email I received from [Sanford]. Did you actually believe that I don't help the PE staff? And what's up with the comment that I don't have to help supervise in the locker rooms. I was so sure that we were pas[t] all of that. It's been 4 years. I have always felt comfortable sharing things with you, especially about my department and personal life. I feel awful!" Shaw responded with a text that stated, "I am

6

very sorry that [*sic*] feel uncomfortable. I am willing to meet with you in person." Long responded, "How would you feel, Emily? I'm beyond feeling uncomfortable. I'm sick to my stomach. But no worries, I'll do whatever you need me to do." Shaw then texted that she was "truly sorry" but that "[t]his is a conversation better had in person."

Shaw explained during her deposition that she understood Long's text to be referring to the policy excluding Long from the locker rooms that was implemented by Platter in 2016, and that when Long stated "it's been 4 years," Long was referring to her transgender status.

Shaw and Long did not end up having an in-person conversation. Long contends she was waiting for Shaw to set up a meeting, and that, in addition, she believed Sanford was going to speak with Shaw on her behalf. Shaw states that she thought she had extended an open invitation for Long to meet with her, which Long could have done by stopping by Shaw's office as she had done in the past, or by speaking with Shaw after a department chair meeting.

As a result of Shaw's decision, Long was removed from supervising the girls' locker room, and she was instead assigned to supervise the commons door. Long was the only physical education teacher who did not have locker room responsibilities.

On January 5, 2020, during the school's winter break, Long sent a letter by email to the District's assistant superintendent for human resources, which stated she was resigning her employment effective January 6, 2020. The notice did not provide any information about why Long was resigning.

B.    *Long's Complaints Filed With the Department of Fair Employment and Housing*

On March 5, 2020, Long filed a charge of discrimination with the California Department of Fair Employment and Housing (DFEH)[4] and the federal Equal Employment Opportunity Commission.  Long specified the discrimination occurred from October 31, 2019, to January 5, 2020.  She provided the following factual description:  "I have been working for Hemet Unified School District since about 8/6/13 to about 1/5/20 as a Physical Education Teacher at Hemet High School.  On about 10/31/19, I was the only PE teacher to be removed from locker room supervision duty and reassigned to campus common door supervision duty.  On about 1/5/20, I was constructively discharged from my job.  No reason was provided for the reassignment or the constructive discharge.  I believe that I was discriminated against due to my sex-gender identity (transgender female), in violation of Title VII of the Civil Rights Act of 1964, as amended."

On September 3, 2020, after retaining counsel, Long filed another complaint with DFEH.  The complaint did not set forth any specific factual description of Long's allegations and instead provided only boilerplate allegations of discrimination, harassment and retaliation by the District and Hemet High School, which were alleged to have occurred "on or about January 31, 2020."  At Long's request when filing the complaint, the DFEH immediately issued a right to sue letter.

---

[4]    By legislative amendment to section 12901 in 2022, the name of DFEH was changed to the Civil Rights Department.  (Stats. 2022, ch. 48, § 30.)  Because the name DFEH was in use at the time Long filed the administrative complaints at issue here, we refer to the department by that name.

C.  *Long's Lawsuit Against the District*

Long filed a lawsuit against the District on October 6, 2020.  The operative second amended complaint (SAC) contains five causes of action.

The first cause of action alleges discrimination based on transgender status in violation of FEHA.  (§ 12940, subd. (a).)  That cause of action states, "During [Long's] employment . . . [the District], through its supervisors, engaged in actions that had a negative impact on the treatment of employees who were transgender," and it specifically avers that Long was "constructively discharged" because of her transgender status.

The second cause of action alleges harassment based on transgender status in violation of FEHA.  (§ 12940, subd. (j)(1).)  Specifically, that cause of action states the District "shunned [Long] in her daily activities, refused to allow her to enter the boys' or girls' locker rooms, and took other actions directed toward [Long] to get her to quit her job because she is transgender."

The third cause of action alleges retaliation in violation of FEHA. (§ 12940, subd. (h).)  With respect to that cause of action, Long states that she "believes, and on that basis alleges, that her complaints about discrimination and harassment because she is a transgender woman was a substantial motivating reason for [the District's] constructive discharge of [Long]."

The fourth cause of action alleges "failure to investigate" in violation of FEHA.

The fifth cause of action alleges "failure to prevent discrimination, harassment and retaliation" in violation of FEHA.

D.  *The Trial Court Grants Summary Judgment in Favor of the District*

The District filed a motion for summary judgment, or in the alternative for summary adjudication.  As to each cause of action, the District argued (1) the statute of limitations barred Long's causes of action to the extent they

9

arose from conduct occurring prior to September 3, 2019;[5] and (2) based on the evidence, Long's claims had no merit. Further, as to the fourth cause of action for "failure to investigate" in violation of FEHA, the District argued that FEHA does not provide for such a cause of action.

The trial court ruled on the summary judgment motion in two stages. First, after a hearing held on October 4, 2023, the trial court granted summary adjudication on the second, third and fourth causes of action (for harassment, retaliation and failure to investigate), but it requested additional briefing on the first and fifth causes of action (for discrimination and failure to prevent discrimination).

After receiving that briefing and holding another hearing on December 12, 2023, the trial court requested that the parties provide yet another round of briefing as to the first and fifth causes of action. In response, the parties filed the further briefing requested by the court, and Long filed a motion for leave to file a third amended complaint, which the District opposed.

On March 15, 2024, the trial court issued orders (1) granting summary judgment as to the remaining first and fifth causes of action; and (2) denying Long's motion for leave to file a third amended complaint.

The trial court concluded that summary judgment was warranted on the first and fifth causes of action for two independent reasons. First, "reinstatement of the locker room ban in October 2019 [was] not alleged in the operative SAC as the reason[ ] for the constructive discharge. . . . [Long] failed to allege in the SAC that her constructive termination was based on anything more than her reassignment in October 2019 to monitor doors in the common area." According to the trial court, in the absence of any

---

5    On appeal, the District no longer relies on the bar of the statute of limitations as a ground to support the judgment.

10

properly pleaded reinstatement of the locker room ban, "[a] reasonable person in [Long's] shoes would not be compelled to resign over the reassignment to monitor doors in the common area."

Second, the trial court explained that even if it "assumed that it was alleged in the SAC that [Long] was 're-banned' from the locker room in 2019," in the trial court's view the evidence did not support Long's contention that the District reinstated the locker room ban. As the trial court stated, "the undisputed evidence shows [Long] stopped abiding by the 2016 locker room ban long before October 31, 2019, which Shaw apparently knew about,"[6] and "[Long] admits she had been routinely entering the locker room and no one was enforcing the locker room ban." Accordingly, if, as Long alleged, "Shaw told Sanford that '[Long] was not allowed in the locker room,' . . . the evidence shows such comments were made only in reference to [Long's] assignment to supervise students at the common area doors instead of the locker room," and was not a reinstatement of the locker room ban.[7] In addition, the trial court

---

[6] The record contains no factual support for the trial court's statement that, when Shaw assigned Long to supervise the commons door, Shaw "apparently knew about" the fact that Long was "routinely entering the locker room." On the contrary, Shaw's declaration states, "I did not know that [Long] had unilaterally decided to return to supervising inside locker rooms until I heard her say that she had done so at her deposition on May 6, 2022." At her deposition, Shaw was confronted with Long's October 31, 2019 email to Shaw and Sanford, in which Long questioned the assignment to supervise the commons door and informed Shaw that she had been supervising the girls' locker room for multiple years. Shaw stated she did not "process it" at the time the email was sent.

[7] The record also does not support the trial court's statement that no evidence supports a "reinstatement," in October 2019, of the policy excluding Long from the locker room. Sanford stated that Shaw told her to convey to Long that Long "couldn't supervise the locker room." As Long described that

11

concluded that because Long did not inform the District about the intolerable working conditions, she could not prevail on a claim of constructive discharge.

Having concluded that Long would not be able to establish discrimination in violation of FEHA, the trial court also concluded there was no merit to the fifth cause of action, which alleged that the District failed to prevent that discrimination.[8]

In denying Long's motion for leave to file a third amended complaint, the trial court explained that "[t]he proposed amendment would be futile because [Long] cannot show she was constructively discharged."

The trial court subsequently entered judgment in favor of the District. Long appeals from the judgment.

## II.

## DISCUSSION

A.   *Applicable Legal Standards for Summary Judgment and Summary Adjudication Motions*

Because Long appeals following orders granting summary judgment and summary adjudication, we first set forth the standards applicable to such rulings.

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that

---

conversation, Sanford told her that, according to Shaw, Long "was not allowed to go into the locker room."

[8]   The trial court's *tentative* ruling, issued after the second round of supplemental briefing, explained the trial court's reason for concluding that the fifth cause of action lacked merit, namely, that "[b]ecause the discrimination claim fails, so too does this claim." However, the trial court neglected in its *final* ruling granting summary judgment to explain why it found the fifth cause of action to be without merit. We infer that the trial court intended to incorporate the reason set forth in its tentative ruling.

the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  A defendant moving for summary judgment has the initial burden of "showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2).)  Once the defendant meets that burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto.  (*Id.*)

"A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment."  (Code Civ. Proc., § 437c.)

In reviewing a ruling on a motion for summary judgment or summary adjudication, we " 'take the facts from the record that was before the trial court when it ruled on that motion.  [Citation.]  " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' "  [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' "  (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39.)

B.     *Long's Challenge to the Summary Adjudication of the Second, Third and Fourth Causes of Action*

We begin our analysis with the summary adjudication of the second cause of action for harassment in violation of FEHA, the third cause of action for retaliation in violation of FEHA, and the fourth cause of action for failure to investigate in violation of FEHA.

1.     *The Second Cause of Action for Harassment in Violation of FEHA*

Under FEHA, it is unlawful "[f]or an employer, . . . because of . . . gender identity [and] gender expression, . . . to harass an employee."

13

(§ 12940, subd. (j)(1).) "Harassment of an employee . . . shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (*Id*.) To prevail on a claim of harassment under FEHA, "an employee must show she was subjected to harassing conduct that was (1) unwelcome; (2) because of [membership in a protected class]; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. [Citations.] In addition, she must establish that the offending conduct was imputable to her employer." (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 627 (*Bailey*).)

Actionable harassment occurs " '[w]hen the workplace is permeated with "discriminatory intimidation, ridicule, and insult" [citation] that is "sufficiently severe" or pervasive to alter the conditions of the victim's employment and create an abusive working environment' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1052–1053 (*Yanowitz*).) The requirement that allegedly harassing conduct be sufficiently severe or pervasive to create an abusive work environment "strikes a 'middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.' " (*Bailey, supra*, 16 Cal.5th at p. 628.) "Whether a work environment is reasonably perceived as hostile or abusive 'is not, and by its nature cannot be, a mathematically precise test.' [Citation.] 'The working environment must be evaluated in light of the totality of the circumstances.' [Citation.] ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citation.] ' "The required level of severity or seriousness

14

varies inversely with the pervasiveness or frequency of the conduct." ' " (*Ibid.*)

In her trial court briefing in opposition to the District's motion for summary judgment, Long focused on a single factual theory to support her second cause of action for harassment. Specifically, Long argued that the District's decision to exclude her from the locker rooms over the course of several years created "a continuing and ongoing environment of humiliation for [Long]." As we will explain, Long's reliance on the locker room policy to support her harassment claim fails to persuade us.

" '[H]arassment refers to bias that is expressed or communicated through interpersonal relations in the workplace,' " and focuses on " 'situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee.' " (*Bailey, supra*, 16 Cal.5th at p. 627.) In contrast, " 'discrimination refers to bias in the exercise of official actions on behalf of the employer.' " (*Ibid.*) " ' "[H]arassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives." ' " (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707 (*Roby*).) Thus, " ' "[c]ommonly necessary personnel management actions . . . do not come within the meaning of harassment. . . . These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment. . . . This significant distinction underlies the differential treatment of harassment and discrimination in the FEHA." ' " (*Ibid.*)

Here, the policy excluding Long from the locker rooms based on her transgender status is best described as an example of alleged "bias in the exercise of official actions on behalf of the employer" (*Bailey, supra*, 16 Cal.5th at p. 627), which took the form of a "personnel management action." (*Roby, supra*, 47 Cal.4th at p. 707.) Therefore, the existence of the policy may support a claim of *discrimination*, but, without more, it does not lend support to a claim of *harassment*. To be sure, in certain instances, the same evidence might support *both* a claim for discrimination due to a personnel management action and a claim for harassment. (*Id.* at pp. 707–709.) However, in such instances, "some official employment actions done in furtherance of a supervisor's managerial role" will "have a secondary effect of communicating a hostile message. This occurs when the actions establish a widespread pattern of bias." (*Roby, supra*, 47 Cal.4th at p. 709.) The record does not contain evidence of any hostile message communicated in connection with imposition of the policy excluding Long from the locker rooms.

In her opening appellate brief, Long focuses on additional items to support her claim for harassment.

First, to support her claim for harassment, Long refers to a statement in her declaration describing Shaw's facial expressions when she and Shaw were wearing similar clothes. Long states, "On one occasion in about 2018, I went to Principal Shaw's office, and realized that she and I were wearing similar clothes. I saw Principal Shaw look at me in disgust. On a second occasion in about 2019, I encountered Principal Shaw outside the Attendance Office (by a ramp) and saw that she and I were wearing the same color (pink) and style blouse. I saw Principal Shaw look at me with horror and disgust when she saw that we were dressed the same. Her reactions were so strong that it communicated plainly that she was appalled at being in a situation

16

where she would be associated with me due to our inadvertent 'twins' outfits those two occasions." However, no reasonable finder of fact could conclude that Shaw's facial expressions on two occasions, standing alone, constituted conduct that was "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." (*Bailey, supra*, 16 Cal.5th at p. 627.) Even assuming that Long correctly perceived that Shaw's facial expressions were due to Long's transgender status, the incidents described by Long fall under the rule that " ' "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" ' are not sufficient to create an actionable claim of harassment." (*Id.* at p. 628.)[9]

Next, Long contends that her harassment claim is supported by the District's conduct following an instance in which a student directed unwanted conduct toward Long based on her transgender status. As Shaw described the incident in her declaration, "The only incident involving any students concerning [Long] that was reported to me occurred in September 2016. I was informed by students on the dance team that a male student had posted a picture and made comments about [Long] in a Snapchat message distributed to other students. I informed [Long] of the incident prior to her knowledge of it. . . . The student was disciplined accordingly by me for his actions. Due to privacy, student discipline is not shared with anyone else besides the student, the student's parents, and appropriate administrators. Student discipline is not shared with teachers. As a result of the discipline, the student did not repeat the behavior." During her deposition, Long explained that she did not see the student's Snapchat message, but she

---

9     Long's appellate briefing also refers to the purported "Apartheid bathroom ban" as evidence that Long experienced harassment based on her transgender status. However, as we have explained, absolutely *no* evidence in the record suggests that such a policy existed. (See fn. 2, *ante*.)

17

understood "there were vulgar comments that were made directly about me, that there was a picture of my body, my back side with a thong on the student's social media page who had made a derogatory comment about me and spoke about the LGBT community . . . in a negative way[,] . . . talking about how he was not raised that way."

Long contends that because the District would not disclose to her the name of the student who posted the message, it created a hostile environment constituting harassment for which the District is liable. The contention is without merit. The undisputed evidence shows that when the District learned of the student's conduct, it took prompt action, which prevented further harmful conduct. In so doing, the District fulfilled its duty to "take immediate and appropriate corrective action" after learning of the harassment. (§ 12940, subd. (j)(1).)[10] Further, the evidence shows that the District's decision not to disclose the student's identity to Long was based on its general policy, rather than on any animosity toward Long.[11]

---

[10] In her appellate reply brief Long states that her harassment claim is also based on "evidence that the [D]istrict 'outed' Ms. Long's transgender status before she was ready to have it made public." The argument is not properly before us because it is raised for the first time in a reply brief. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218.) Moreover, Long fails to provide a citation to evidence in the appellate record to support the argument.

[11] Long points to Education Code sections 49079, 48900.4 and 48900, subdivision (i) as support for her contention that she was "entitled" to information about the student's identity. Those statutes require a school district to inform a teacher of a pupil who has engaged in certain activity (Ed. Code, § 49079, subd. (a)), including "harassment, threats, or intimidation, directed against school district personnel or pupils, that is sufficiently severe or pervasive to have the actual and reasonably expected effect of materially disrupting classwork, creating substantial disorder, and invading the rights of either school personnel or pupils by creating an intimidating or hostile

In sum, we conclude that the trial court properly granted summary adjudication on the second cause of action for harassment in violation of FEHA.

2.      *The Third Cause of Action for Retaliation in Violation of FEHA*

Long's third cause of action alleged retaliation in violation of FEHA. That claim is based on the statutory provision making it unlawful for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  (§ 12940, subd. (h).)

To establish a prima facie case of retaliation under FEHA, "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."  (*Yanowitz, supra*, 36 Cal.4th at p. 1042.)  As stated in the statute, protected activity refers to the activity of having "opposed any practices forbidden under this part" or having "filed a complaint, testified, or assisted in any proceeding under this part."  (§ 12940, subd. (h); see also *Yanowitz* at p. 1042.)  "[A] retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA."  (*Yanowitz*, at p. 1043.)

In her trial court briefing in opposition to the District's motion for summary judgment, Long argued that the evidence showed she engaged in

educational environment" (*id.*, § 48900.4) or "[c]ommitt[ing] an obscene act or engaged in habitual profanity or vulgarity" (*id.*, § 48900, subd. (i).).  Here, there is no evidence that the student's conduct rose to that level.

the protected activity of complaining to Sanford and Shaw about the policy excluding her from the locker rooms, and that, in retaliation, the District assigned her to supervise the commons door.[12]

However, that theory of retaliation is not supported by the evidence. The undisputed evidence is that Shaw assigned Long to supervise the commons door *before* Long complained about the reinstatement of the policy excluding her from the locker rooms. Thus, Long cannot establish that, after engaging in the protected activity of complaining about being excluded from the locker rooms, she was subject to any adverse employment action as a result of having done so. (*Yanowitz, supra*, 36 Cal.4th at p. 1042 [prima facie case requires "a causal link . . . between the protected activity and the employer's action."].)

3. *The Fourth Cause of Action for Failure to Investigate in Violation of FEHA*

Long's fourth cause of action was labeled "failure to investigate in violation of the FEHA." (Capitalization omitted.)

The District's motion for summary judgment argued that "[t]here is no separate cause of action under the FEHA for 'failure to investigate' discrimination or harassment. Rather, the FEHA only makes it unlawful for employers to fail 'to prevent' discrimination or harassment." (See § 12940, subd. (k) [making it unlawful for an employer "to fail to take all reasonable

---

[12] In her opening appellate brief, Long contends that the protected activity at issue in her retaliation cause of action consisted of her complaining to Sanford and Shaw "about the order barring her from entering the bathroom." Long states that, as a result of that complaint, Shaw "reinstated the ban prohibiting Ms. Long from entering the locker rooms." Long's argument is untethered to the facts. As we have explained there was no order barring Long from entering the bathrooms at the school, and thus no evidence that Long complained about any such ban.

20

steps necessary to prevent discrimination and harassment from occurring"].) That theory is set forth in Long's fifth cause of action for "failure to prevent discrimination, harassment, and retaliation in violation of the FEHA." (Capitalization omitted.)

In her opposition brief in the trial court, Long did not attempt to set forth any legal basis for her fourth cause of action that was separate from her fifth cause of action. Instead, she argued, "Whether or not [Long's] claims for Failure to Investigate and Failure [to] [P]revent should be one or two causes of action, the fact remains that, for both, the underlying claims are fully supported." Accordingly, the trial court granted summary adjudication on the fourth cause of action on the following basis: "[Long] does not dispute that this claim is duplicative of the 5th cause of action for failure to prevent discrimination, harassment and retaliation. Though it is titled 'failure to investigate,' the allegations are nearly identical to the allegations supporting the failure to prevent claim. . . . And [Long] does not make any distinction between these two claims in the opposition.

On appeal, although Long does not clearly explain her position, she apparently intends to challenge the summary adjudication of the fourth cause of action for failure to investigate. In doing so, however, she continues to *combine* that cause of action with the fifth cause of action as if they were the *same* claim. Referring to both causes of action together, she states that the trial court "erred in granting summary adjudication as to Ms. Long's 'failure to investigate and prevent' claim."

Long has not identified any statutory authority for her fourth cause of action alleging "failure to investigate" in violation of FEHA that is distinct from her fifth cause of action for failure to prevent discrimination,

21

harassment, and retaliation in violation of FEHA. Accordingly, we affirm the summary adjudication in favor of the District on the fourth cause of action.

C. *Long's Challenge to the Summary Judgment on the First and Fifth Causes of Action*

We next turn to the summary judgment on the first cause of action for discrimination in violation of FEHA and the fifth cause of action for failure to prevent discrimination and retaliation in violation of FEHA.

1. *The First Cause of Action for Discrimination in Violation of FEHA*

FEHA makes it "an unlawful employment practice . . . (a) For an employer, because of . . . gender identity [or] gender expression, . . . to bar or to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940.) Long contends that the District discriminated against her due to her gender identity or gender expression as a transgender woman when it reaffirmed the policy excluding her from the locker rooms in 2019. According to Long, that policy adversely affected the terms, conditions, or privileges of her employment and led to her constructive discharge.

a. *Long's Complaint With DFEH and Her SAC Adequately Identify the Policy Excluding Long From the Locker Rooms as a Basis for Her Discrimination Claim*

As an initial matter, before turning to the merits of Long's cause of action alleging discrimination in violation of FEHA, we address the District's attempt to limit the scope of that claim.

Long explained during the litigation of the summary judgment motion that her discrimination claim was based on the fact that, in October 2019, the District reaffirmed the policy excluding her from the locker rooms. However, on appeal, the District contends that Long is not permitted to base her discrimination claim on that theory because it purportedly was not raised in

22

Long's administrative complaints to DFEH and was not pled in the SAC. According to the District, for the purpose of its summary judgment motion, Long's discrimination claim must be limited to a claim of constructive discharge based on the District's decision to assign Long to supervise the commons door. Based on that limitation, the District would have us disregard the evidence that, as of 2019, the District reaffirmed its policy of excluding Long from supervising students in the locker rooms due to her transgender status. As we will explain, we reject the District's attempt to limit the basis for Long's discrimination claim in that manner.

"An employee who wishes to file suit under the FEHA 'must exhaust the administrative remedy provided by the statute by filing a complaint with the' DFEH, 'and must obtain from the [DFEH] a notice of right to sue.' [Citation] 'The timely filing of an administrative complaint' before the DFEH 'is a prerequisite to the bringing of a civil action for damages.' " (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931.) "To exhaust his or her administrative remedies as to a particular act made unlawful by the [FEHA], the claimant must specify that act in the administrative complaint, even if the complaint does specify other cognizable wrongful acts." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1724 (*Martin*).) " '[T]he failure to exhaust an administrative remedy is a jurisdictional, not a procedural, defect,' and thus that failure to exhaust administrative remedies is a ground for a defense summary judgment." (*Ibid*.)

The District contends that Long did not exhaust her administrative remedies to be able to bring a discrimination claim premised on the theory that the District reaffirmed its policy excluding her from the locker rooms in

2019.[13] We disagree. In her administrative complaint filed on March 5, 2020, Long alleged that on October 31, 2019, she "was the only PE teacher *to be removed from locker room supervision duty* and reassigned to campus common door supervision duty," which she believed was based on her "sex-gender identity (transgender female)." In determining whether this statement sufficiently encompasses Long's allegation of discrimination in this lawsuit, we must construe the statement "liberally in favor of plaintiff" and "in light of what might be uncovered by a reasonable investigation." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 268.) Our role is to examine whether Long's discrimination claim in this lawsuit is " 'like and reasonably related to' " her complaint to DFEH. (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 154; see also Cal. Code Regs, tit. 2, § 10003 [mandating that DFEH "liberally construe all complaints to effectuate the purpose of the laws the department enforces . . . ."].) As we interpret Long's DFEH complaint, because it complains that she was "*removed* from locker room supervision" due to her "sex-gender identity (transgender female)," it reasonably encompasses Long's claim in this lawsuit that the District discriminated against her in October 2019 when it reaffirmed its policy excluding her from supervising students in the locker rooms due to her transgender status.

---

[13] In the trial court, the District did not make an exhaustion argument in its moving papers for summary judgment. The District identified the issue during the second hearing on the summary judgment motion, and the trial court requested that the parties provided briefing to address it. Because the issue is jurisdictional (*Martin, supra*, 29 Cal.App.4th at p. 1724) and could, in any event, be raised on remand, we exercise our discretion to address it here, even though it was not within the scope of the District's summary judgment motion.

Next, in relying on the principal that " '[t]he burden of a defendant moving for summary judgment only requires that [the defendant] negate plaintiff's theories of liability *as alleged in the complaint*'" (*Ahn v. Stewart Title Guaranty Co.* (2023) 93 Cal.App.5th 168, 181–182), the District argues that "Long failed to allege in the SAC that her constructive termination was based on anything more than her reassignment in October 2019 to monitor the doors in the common area." The argument lacks merit.

In its general factual allegations, the SAC alleges that when Long notified the District of her planned transition, she was instructed that she was "not allowed to enter neither the boy[s'] nor girl[s'] locker room," and "[t]his mandate lasted up until her forced resignation." The complaint further alleges that on October 31, 2019, Long was informed that "her job responsibilities were being changed to that of campus security as she now had to monitor the doors in the commons area. Ms. Long was stunned about the demotion. No non-transgender Physical Education teachers were assigned this task." (Capitalization omitted.) The first cause of action for discrimination in violation of FEHA reincorporates these allegations, without singling out any of them. That cause of action alleges, based on all of the foregoing factual allegations, that "[d]uring [Long's] employment . . . [the District], through its supervisors, engaged in actions that had a negative impact on the treatment of employees who were transgender," and that Long was "constructively discharged" because of her transgender status. We conclude that although the SAC could have been more precise about the facts surrounding the District's assignment of Long to supervise the commons doors and the relationship of that assignment to the policy barring Long from the locker rooms, the complaint nevertheless does identify the District's exclusion of Long from the locker rooms based on her transgender status.

25

Further, the SAC alleges that the policy existed until the end of Long's employment. Those allegations fulfill the requirement of "giv[ing] fair notice to the opposing party of the theories on which relief is generally being sought." (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 422.)[14]

b. *The District Did Not Establish Long Would Be Unable To Prevail on Her First Cause of Action Alleging Discrimination in Violation of FEHA*

Having rejected the District's attempt to limit the scope of Long's discrimination cause of action, we turn to the question of whether summary judgment was warranted on that cause of action.

"In employment discrimination cases under FEHA, plaintiffs can prove their cases in either of two ways: by direct or by circumstantial evidence." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 549 (*DeJung*).)

"When a plaintiff proffers circumstantial evidence, California courts apply the three-stage burden-shifting test established by the United States Supreme Court for trying claims of employment discrimination . . . based on a theory of disparate treatment." (*DeJung, supra*, 169 Cal.App.4th 533, 549.) At the first stage, "[t]o state a prima facie case for discrimination in violation of the FEHA, a plaintiff must establish that (1) she was a member of a protected class, (2) she was performing competently in the position she held, (3) she suffered an adverse employment action, and (4) some other circumstance suggests discriminatory motive. [Citation.] Once an employee

---

14    Because we conclude that the SAC sufficiently pleads the theory that the District discriminated against Long based on its policy excluding her from the locker rooms in 2019, we need not, and do not, consider Long's contention that the trial court erred in denying her motion for leave to file a third amended complaint that would more clearly plead that theory of discrimination.

establishes a prima facie case, a presumption of discrimination arises, and the employer is required to offer a legitimate, nondiscriminatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate, nondiscriminatory reason for the adverse employment action, the presumption of discrimination drops out of the picture, and the burden shifts back to the employee 'to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.' " (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 577 (*Ortiz*).)

"This framework is modified in the summary judgment context: ' "[T]he employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." ' [Citation] 'If the employer meets its initial burden, the burden shifts to the employee to "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." ' " (*Ortiz, supra*, 37 Cal.App.5th at pp. 577–578, italics omitted.)

The burden-shifting test does not apply, however, when the plaintiff presents *direct* evidence of discrimination. (*De Jung, supra*, 169 Cal.App.4th at p. 550.) "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." (*Ibid*.) " 'Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the

unlawful factor.' " (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1145.)

The District's motion for summary judgment proceeded under the assumption that Long was relying on circumstantial evidence to prove discrimination, and it accordingly applied a burden shifting analysis. Long in contrast contended she provided direct evidence of discrimination that made the burden shifting analysis inapplicable.

Continuing to view this case as controlled by the burden shifting analysis applicable to circumstantial evidence cases, the District argues on appeal that summary judgment was warranted on the discrimination cause of action for two reasons. First, based on its view that the basis for Long's discrimination claim is limited to the District's decision to assign her to supervise the commons door, the District argues it has presented admissible evidence of a legitimate nondiscriminatory reason for assigning Long to that duty, which Long will not be able to show is pretextual. Second, the District argues that even if there is a triable issue of material fact as to whether it acted with a discriminatory motive, Long nevertheless cannot establish an adverse employment action as a result of any discrimination because she cannot show she was constructively discharged. We address these arguments in turn.

i. *Legitimate Nondiscriminatory Reason*

In contending that it had a legitimate nondiscriminatory reason for the actions that Long targets in this lawsuit, the District states, "Long appears to argue that her reassignment to monitor the commons doors must be based on discriminatory intent. In doing so, she ignores [the] valid and necessary purpose of the assignment: to prevent physical education students' access to other part[s] of campus and the resulting disruption to other classrooms."

28

The District also points out that the role of supervising students was within Long's duties as a teacher, and that, at some point, at least one other physical education teacher was assigned to supervise the commons door.

This argument is not persuasive because, as we have discussed, Long's complaint to DFEH and her SAC show that the focus of Long's discrimination claim is *not* the District's decision to assign Long to supervise the commons door in October 2019. Instead, Long's claim of discrimination is based on the District's decision to reaffirm the policy excluding Long from the locker rooms.

When Long's discrimination claim is understood to be based on the District's policy excluding Long from the locker rooms, that claim is supported by *direct* evidence of discrimination that makes the burden shifting analysis inapplicable. (*De Jung, supra*, 169 Cal.App.4th at p. 550.) Statements by Shaw and Long that appear in the record provide direct support for findings that (1) the District, through Platter in 2016, implemented a policy excluding Long from the locker rooms that was *expressly* based on Long's transgender status; and (2) the same policy, still based on Long's transgender status, was reaffirmed by Shaw in October 2019. The District does not attempt to argue otherwise, and it proffers no legitimate nondiscriminatory reason for the locker-room policy.

Accordingly, when Long's claim of discrimination is understood as being based on the policy excluding her from the locker rooms, the District has failed, in its motion for summary judgment, to "present admissible evidence showing that the adverse employment action alleged by Long was 'based upon legitimate, nondiscriminatory factors.' " (*Ortiz, supra*, 37 Cal.App.5th at p. 577.) On the contrary, the record contains direct

evidence that the District took action against Long precisely because of her status as a transgender person.

ii.    *Adverse Employment Action*

The District next argues that regardless of whether there is a triable issue of material fact as to whether it acted against Long out of a discriminatory motive, Long nevertheless cannot prevail on her discrimination claim because she will not be able to establish any adverse employment action.

FEHA's provision making it unlawful for an employer to commit discrimination requires an "adverse employment action" (*Yanowitz, supra*, 36 Cal.4th at p. 1049; *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 355), which the statute defines as either (1) discharge; (2) discrimination in compensation; or (3) discrimination "in terms, conditions, or privileges of employment." (§ 12940, subd. (a).)  FEHA "protects an employee against unlawful discrimination with respect not only to so-called ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Yanowitz*, at pp. 1053–1054.)  Thus, "the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Id.* at p. 1054.)

Long argued in the trial court that she suffered an adverse employment action *both* because she was constructively discharged *and* because, even without constructive discharge, the District's policy excluding her from the

30

locker room impacted the terms, conditions, or privileges of employment. According to Long, the locker-room policy impacted the terms, conditions, or privileges of employment because it (1) deprived Long of the faculty offices in the locker rooms, (2) "forced her to arrive early or leave late" so she could access the locker rooms, (3) "deprived [her] of access to instructional materials during the school-day," (4) required her to "embarrassingly ask students to retrieve items from the locker room," and (5) "deprived [her] of convenient restroom facilities." However, focusing *solely* on Long's contention that she was constructively discharged due to the policy excluding her from the locker rooms, the District argues that Long will not be able to satisfy the requirements for showing a constructive discharge and thus cannot establish an adverse employment action.

"Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244–1245 (*Turner*).) "In order to establish a constructive discharge, an employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. For purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Id*. at p. 1251.) "The conditions giving rise to the resignation

must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." (*Id*. at p. 1246.) "In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Id*. at p. 1247.) "[T]he standard by which a constructive discharge is determined is an objective one—the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' " (*Id*. at p. 1248.)

The District argues that no reasonable person in Long's situation would be compelled to resign. However, in making that argument, the District frames the issue as whether reassignment *to supervise the commons door* constituted sufficiently intolerable or aggravated working conditions to compel Long's resignation. The District points out that (1) at some point, at least one other teacher was assigned to perform that same task and did so without complaint or experiencing humiliation; and (2) supervision of students was well within Long's normal duties as a teacher. The District's argument fails because Long's discrimination claim is actually based on the District's reaffirmation of the policy excluding her from the locker rooms in October 2019, not merely her reassignment to supervise the commons door.

As Long states, she found the policy excluding her from the locker rooms to be humiliating, and the reaffirmation of that policy was "the last straw," in response to which she resigned. As Long described in her text to Shaw, after finding out about the reaffirmation of the policy excluding her from the locker rooms she "fe[lt] awful" and was "sick to [her] stomach" because she believed they were "pas[t] all that" due to the passage of time.

32

Indeed, in October 2019, it had been more than three years since Long transitioned to presenting as female at work, but Shaw nevertheless reaffirmed that Long was *still* excluded from the school's locker rooms. Those facts are sufficient to raise a triable issue of material fact as to whether a reasonable person in Long's position would be compelled to resign due to the demeaning and humiliating nature of the policy against her as a transgender person.[15]

The District further contends that Long will not be able to establish constructive discharge because she purportedly did not complain to the District that the policy excluding her from the locker rooms was intolerable. However, because the discriminatory policy was implemented *by supervisory employees* at the District, there was no legal requirement that Long notify the District that she found the policy to be intolerable before resigning. "[A]n employee seeking to establish a constructive discharge must show that the employer *either* intentionally created *or* knowingly permitted the intolerable working conditions, and that the intent or knowledge must exist on the part of the employer *or those persons who effectively represent the employer, including supervisory employees.*" (*Ortiz, supra*, 37 Cal.App.5th at p. 579.) The policy at issue here was intentionally created by the District, through its supervisors, giving the District sufficient knowledge of the discriminatory policy's existence without any further action by Long.

---

[15] Because we conclude that Long presented evidence sufficient to raise a triable issue as to whether she was constructively discharged, we need not, and do not, consider Long's alternative argument that the evidence showed that she suffered an adverse employment action due to the impact of the District's locker room policy on the terms, conditions or privileges of her employment. (Cf. *Ortiz, supra*, 37 Cal.App.5th at p. 580 fn. 6.)

In sum, the District has failed to show that Long will be unable to prevail on her first cause of action for discrimination in violation of FEHA. Accordingly, the trial court erred in granting summary judgment on that cause of action.

2. *The Fifth Cause of Action for Failure To Prevent Discrimination or Harassment*

FEHA makes it unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) Long's fifth cause of action alleges that the District violated this provision.

"[C]ourts have required a finding of actual discrimination or harassment under FEHA before a plaintiff may prevail under section 12940, subdivision (k)." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925, fn. 4.) Based on this principle, the District argued in the trial court that summary judgment was warranted on the fifth cause of action because Long would be unable to prevail on her underlying harassment or discrimination claims. Here, however, as we have explained, a triable issue of fact exists as to the first cause of action for discrimination that precludes summary judgment. Accordingly, the District is unable to prevail on summary judgment as to the fifth cause of action by establishing lack of merit to each of Long's underlying claims.

In the trial court, the District made an alternative argument for summary judgment on the fifth cause of action. Specifically, the District argued that it could not be held liable on the failure-to-prevent cause of action because it has "policies and procedures" relating to prevention of harassment, discrimination and retaliation. (Cf. *California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1025 [to prevent discrimination, apart from prompt investigation of a

34

discrimination claim, "[o]ther reasonable steps an employer might take include the establishment and promulgation of antidiscrimination policies and the implementation of effective procedures to handle complaints and grievances regarding discrimination"].) In support of that argument, the District relied on two exhibits. The first exhibit was Long's signature when she was hired in 2013, by which she verified that she had received various information, including the "Board Policy-Sexual Harassment," "Board Policy-Nondiscrimination in District Programs" and "Board Policy-Nondiscrimination in Employment." The second exhibit was an excerpt from Long's deposition confirming that she had received those documents.

However, in support of its summary judgment motion, the District did not include any of the relevant policies themselves. We know only that Long received the policies, whatever they may contain. Without any information about what policies and procedures the District has adopted to try to prevent discrimination, the District has not met its burden on summary judgment to establish Long will be unable to prove that the District "fail[ed] to take all reasonable steps necessary to prevent discrimination . . . from occurring" (§ 12940, subd. (k)) as alleged in the fifth cause of action.

We accordingly reverse the trial court's ruling granting summary judgment on the fifth cause of action.

35

## DISPOSITION

We reverse the judgment, and we remand for further proceedings on the first cause of action for discrimination in violation of FEHA and the fifth cause of action for failure to prevent discrimination in violation of FEHA. Long shall recover her costs on appeal.

KELETY, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.